396 So.2d 645 (1980)
In the Matter of Gilbert Franklin BECK
v.
STATE of Alabama.
77-530.
Supreme Court of Alabama.
December 19, 1980.
As Modified on Denial of Rehearing March 6, 1981.
*647 John L. Carroll and Stephen J. Ellmann, Montgomery, for petitioner.
Charles A. Graddick, Atty. Gen., and Ed Carnes, Asst. Atty. Gen., for respondent.
MADDOX, Justice.
The Supreme Court of the United States, upon review of this case, framed the issue presented to that Court as follows:
May a sentence of death constitutionally be imposed after a jury verdict of guilt of a capital offense when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict?
A majority of the Supreme Court of the United States determined that a death sentence may not be imposed after a jury verdict of guilt of a capital offense when the jury is not permitted to consider a verdict of guilt of a lesser included offense, when the evidence would have supported such a verdict. Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).
The State concedes that there was an evidentiary basis for lesser included offense instructions in Beck's case, and also concedes that Beck is entitled to a new trial, but contends that the death penalty would be an available option to the State in Beck's new trial. Beck agrees with the State that he is entitled to a new trial, but strongly disagrees that the death penalty would be an available option to the State in his new trial, claiming that the Supreme Court of the United States has found Alabama's Death Penalty Statute, when viewed as a whole, patently unconstitutional.
*648 The issue, therefore, is clearly drawn. The State argues that this Court can sever two provisions from Alabama's Death Penalty Statute in a manner that would permit the imposition of death as a punishment; defendant Beck strongly disagrees.
The two clauses of Alabama's Death Penalty Statute which are involved in this dispute are found in Code 1975, § 13-11-2(a). That section provides:
(a) If the jury finds the defendant guilty, it shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation, which must also be averred in the indictment, and which offenses so charged with said aggravation shall not include any lesser offenses.... [Emphasis supplied.]
The last phrase of § 13-11-2(a), which precludes the trial judge from giving lesser included offense instructions in capital cases, is the one found constitutionally infirm by the Supreme Court of the United States. The State argues that this Court can sever this clause from the statute and requests that this Court do exactly that. The State also asks this Court to sever the clause which requires that the jury fix the punishment at death if it finds the defendant guilty of a capital offense.
Because of the importance of our decision on not only this case, but possibly other capital cases which have been tried under Alabama's Death Penalty Statute, we will discuss in this opinion the historical development of the death penalty in Alabama, the category of crimes for which the death penalty could be imposed, and the effect of decisions by the Supreme Court of the United States, particularly the decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), on the imposition of the death penalty. We will also determine legislative intent in passing the Death Penalty Statute now under consideration, and will decide whether this Court can, or should, exercise its inherent power to formulate guidelines which the Supreme Court of the United States has judicially determined to be constitutionally required in death cases.

HISTORY OF THE DEATH PENALTY IN ALABAMA
The death penalty has always existed in Alabama as a means of punishing those who commit the most serious crimes. What constituted the most serious crimes was necessarily dependent upon societal interests and values existing at the time the various death penalty statutes were adopted. These societal interests and values most often reflected traditional views of what offenses authorized the imposition of death and, during part of Alabama's history, reflected the interaction and relative position of the races, especially during the period prior to the Civil War, when slaves and free Negroes were admittedly singled out for special treatment insofar as capital punishment was concerned. Nevertheless, with that one exception, the history of capital punishment in this state, from pioneer days until the present, reveals a decided attitude that for certain aggravated offenses, especially those which involve the intentional killing of another, only death stands as a commensurate punishment.
In 1807, the Legislative Council and House of Representatives of the Mississippi Territory enacted the first "criminal code" to be in force in the territory (a portion of which would later become the State of Alabama). See, H. Toulmin, A Digest of the Laws of the State of Alabama, Tit. 17 (1823). This criminal code authorized death by hanging as a mode of punishment (Tit. 17, Chapt. 1, § 50), and specified ten capital crimes. These original capital crimes were willful murder (Tit. 17, Chapt. 1, § 1), arson (Tit. 17, Chapt. 1, § 8), rape (Tit. 17, Chapt. 1, § 6), robbery (Tit. 17, Chapt. 1, § 10), burglary (Tit. 17, Chapt. 1, § 11), accessory before the fact to any murder, arson, rape, robbery or burglary (Tit. 17, Chapt. 1, § 12), treason (Tit. 17, Chapt. 1, § 2), slave stealing (Tit. 17, Chapt. 1, § 18), selling a free person as a slave (Tit. 17, Chapt. 1, § 7), and counterfeiting coins (Tit. 17, Chapt. 1, § 26). In 1812, an amendment to the 1807 Code was passed specifying three additional capital *649 crimes, i. e., aiding any insurrection by slaves (Tit. 17, Chapt. 5, § 3), conspiracy by any slave to commit murder or rebel (Tit. 17, Chapt. 5, § 7), and forgery (Tit. 17, Chapt. 6, § 6). Each of these capital statutes was mandatory in nature, providing that any person who committed the specified crimes "shall suffer death." Excluding those statutes which were founded upon societal values extant during the period when slavery was legal in Alabama, only the following crimes were deemed serious enough to warrant the death penaltymurder, arson, rape, robbery, burglary, treason, forgery and counterfeiting.
By the close of the Legislative General Assembly in January of 1833, the death penalty laws of the state had not undergone any significant changes. See, J. Aikin, A Digest of the Laws of the State of Alabama (1833). The thirteen crimes previously specified were again found deserving of capital punishment. In addition, a new subsection was added to the criminal code entitled Crimes and Misdemeanors by Persons of Color. This subsection recognized three new capitally punishable crimes, viz., any second conviction of any Negro or mulatto whatsoever (p. 113, § 75), accessory of any sort to a capital crime or maiming of any white person by a slave (p. 114, § 78), and any attempt to commit a rape on any free white female by any person of color (p. 114, § 80). Outside of this subsection, the only new capital crime found under the Code was circulating seditious papers for the purpose of inciting insurrection among the slaves (p. Ill, § 66). The penalty under these statutes was again mandatory. The only major alteration, whether deemed procedural or substantive, that took place in the usage of the death penalty was pursuant to § 36 of the 1833 Code, which provided that the death penalty could not be imposed except in those cases expressly authorized by statute; however, a dramatic change took place on January 9, 1836, when the legislature of the State passed an act to mitigate the severity of its penal laws (1836 Ala. Acts, Act No. 48). That act provided that white citizens could no longer be capitally punished for the crimes of arson, robbery or burglary; Blacks convicted of those crimes could be sentenced to death. In addition, punishment for the crimes of forgery and counterfeiting was reduced to terms of imprisonment. As a result of this act, only the following crimes (excluding those based upon cultural and racial considerations) could be punished by the imposition of deathmurder, rape and treason. As for these crimes, the death penalty was mandatory.
In 1841, history was made in Alabama with the passage and enactment of Alabama's first official penal code. See, A. Meek, A Supplement to Aikin's Digest on the Laws of the State of Alabama (1841). This penal code accomplished a variety of things, including the establishment of a statewide penitentiary system. As concerns the usage and imposition of the death penalty, the mandatory language of prior statutes was removed and jury discretion was authorized.[1] The statutes enacted at this time represent the forerunners of the death penalty statutes eradicated in the wake of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Under this 1841 code, the death penalty (or life imprisonment at the discretion of the jury), could be imposed for the following offensestreason (Penal Code, Chapter II, § 1), murder in the first degree (Penal Code, Chapter III, § 1), aiding any insurrection by slaves (Penal Code, Chapter II, § 2), circulating seditious papers for the purpose of inciting insurrection among slaves (Penal Code, Chapter II, § 4), and killing any slave in a barbarous manner (Penal Code, Chapter III, § 5). Rape, which under every statute prior to 1841 was punished capitally, could now only be punished by life imprisonment (Penal Code, Chapter III, § 14). Punishments for *650 other previously capital crimes were similarly reduced to terms of imprisonment (e. g., selling any free person as a slavereduced to ten years). Robbery was deemed punishable by imprisonment for not less than ten years (Penal Code, Chapter III, § 28), burglary by imprisonment for not less than three nor more than fifty years (Penal Code, Chapter IV, § 64), and first degree arson by imprisonment for not less than fourteen years (Penal Code, Chapter IV, § 68).
The final chapter of the Penal Code of 1841 pertained to crimes by slaves and free Negroes. Admittedly, as was true of the societal values then existing, the Code treated these individuals much more harshly. The imposition of the death penalty for the following crimes can only be explained by deferring to historyconspiracy by any slave to murder or rebel (Penal Code, Chapter XV, § 1), murder of any white person or assault with intent to murder any white person by any slave (Penal Code, Chapter XV, § 2), rape or attempt to commit rape of any white female by any slave or free Negro (Penal Code, Chapter XV, § 3), burglary, robbery or maiming of any white person by a slave (Penal Code, Chapter XV, § 4), and arson by any slave (Penal Code, Chapter XV, § 5). These statutes were mandatory in nature.
The 1841 Penal Code as described above remained unchanged until the ratification and passage of the Code of Alabama of 1852.
Under the first official Code of Alabama, enacted in 1852, death by hanging was expressly authorized as one of several modes of punishment (§ 3069); however, even though it was clearly specified, its use was authorized in very limited instances. Outside of the various slave statutes enacted in 1841, and recodified under the 1852 Code (§§ 3306-3313), death could only be imposed in two limited situations, viz., where the defendant was convicted of murder in the first degree (§ 3080), or where the defendant was convicted of treason (§ 3075). In these limited cases, death could be imposed at the discretion of the jury. Other serious crimes were specified under the Code as deserving of a less severe punishment, i. e., life imprisonment. These crimes were rape (§ 3090), carnal knowledge of a female above ten years of age by administering to her any substance which prevents an effectual resistance (§ 3091), and carnal knowledge of a female under ten years of age (§ 3092). Other crimes now considered serious were deemed punishable only by terms of imprisonment (e. g., robbery [not less than ten years (§ 3104)], burglary [three to fifty years (§ 3184)], first degree arson [not less than fourteen years (§ 3193)]). As is apparent, under the 1852 Code, the usage of the death penalty was narrowly confined.
The revised Code of Alabama of 1867 (post-Civil War), reveals that the so-called Reconstruction Legislature expanded significantly the crimes for which the death penalty could be imposed. Like the Code of 1852, the Code of 1867 authorized death by hanging as one of several forms of punishment. Similarly, treason (§ 3547), and murder in the first degree (§ 3653), were specified as two crimes for which a sentence of death could be imposed; however, in addition to these two crimes, the legislature authorized the imposition of the death penalty when a defendant was convicted of any of the following crimesrape (§ 3661), carnal knowledge of any female above ten years of age by administering to her any substance which prevents an effectual resistance (§ 3662), carnal knowledge of any female under ten years of age (§ 3663), carnal knowledge of any married woman by falsely impersonating her husband (§ 3664), robbery (§ 3668), and first degree arson (§ 3697). The imposition of the death penalty in such cases was, as before, to be governed entirely by the discretion of the jury. All in all, the 1867 Code represented a return to the pre-1836 treatment of these offenses. In short, the Reconstruction Legislature reinstituted the death penalty for certain crimes, but abrogated the slavery statutes which previously characterized the Code of 1852.
The Code of 1867 also contained the first statutes concerning the capital punishment *651 of crimes committed by convicts serving life sentences. Specifically, the Code provided that any convict, sentenced to imprisonment for life, who committed murder (§ 3900), assault with intent to commit murder (§ 3901), or effectuated an escape or attempted to escape (§ 3902), should suffer death. The statutes were mandatory.
The Code of Alabama of 1876 made no changes in Alabama's death penalty law. Jury discretion continued to govern its imposition for the following crimestreason (§ 4100), murder in the first degree (§ 4296), rape (§ 4304), carnal knowledge of any female over ten years of age by administering any substance which prevents an effectual resistance (§ 4304), carnal knowledge of any female under ten years of age (§ 4306), carnal knowledge of any married woman by impersonating her husband (§ 4307), robbery (§ 4311), and arson (§ 4346). Likewise, the convict statutes remained the same except that escapes or attempted escapes by life inmates were no longer punishable by death. (See, §§ 4598 and 4599.)
The Code of Alabama of 1887 contained no changes. Prior Alabama criminal law was merely recodified with the death penalty remaining as a viable criminal punishment. Comparative sections were as followstreason (§ 3724), murder in the first degree (§ 3729), convict murder (§ 3730), convict assault with intent to commit murder (§ 3752), rape (§ 3736), carnal knowledge of any female over ten years of age by administering any substance which prevents an effectual resistance (§ 3738), carnal knowledge of any female under ten years of age (§ 3739), carnal knowledge of any married woman by impersonating her husband (§ 3740), robbery (§ 3742), and arson (§ 3780). Jury discretion remained the standard for imposing a sentence of death.
The Code of Alabama of 1897, like its predecessor, contained no major substantive changes. The only changes which did occur involved the age specification in the carnal knowledge statutes. To be specific, the statutes raised the age designation from ten to fourteen years. See, §§ 5446, 5447 and 5449. In addition, the 1897 Code added as a new capital offense, the crime of train robbery (§ 5480); beyond that, the capital offenses remained exactly the same.
With the turn of the century and the enactment of yet another Code of Alabama, the death penalty remained a viable means of punishing individuals who committed certain aggravated offenses. See, Code of 1907, § 7620. The 1907 Code added yet another capital offense to those traditionally recognized, that offense being the crime of kidnapping for ransom (§ 6214). Other than that, the 1907 Code recodified verbatim prior existing criminal statutes.
The most striking contribution which the Code of 1923 would make to the history of the death penalty in Alabama was its modification of the manner in which the death penalty would be imposed. Under all previous codes and statutes, death by hanging was the statutorily defined means of punishing a defendant capitally; by virtue of § 5309 of the Code of 1923, death by electrocution would thenceforth be the method. Other than the change of the method of execution of the death sentence, the Code of 1923 followed its immediate predecessor in its entirety.
The 1928 recompilation of the Code of 1923 made no changes in Alabama's death penalty law, save the addition and definition of yet another capital offense, i. e., exploding or setting off any dynamite in or under any steamboat, or vessel, or railroad car, in which there is at the time any human being, or any prison or jail, or any other house or building, which is occupied by a person, or any inhabited dwelling (§ 3886). As in all other capital cases, the imposition of the death penalty was to be fixed at the discretion of the jury.
These older codes and statutes show the evolution and constant development of Alabama's death penalty law between 1819 and 1940. The 1940 Alabama Code added three new capital offenses (attempted kidnapping [Tit. 14, § 8], second degree arson [Tit. 14, § 24], and burglary in the first degree [Tit. 14, § 85]). In 1943, the legislature adopted what the Supreme Court of the United *652 States, in Coleman v. Alabama, 377 U.S. 129, 84 S.Ct. 1152, 12 L.Ed.2d 190 (1964), called an "enlightened procedure" of an automatic appeal which now formulates a very important factor in achieving a uniform imposition of the death penalty (1943 Ala. Acts, Act No. 249). Thus, prior to Furman (ignoring all the procedural developments in the administration of the death penalty), the following offenses were punishable by death by electrocution or life imprisonment at the discretion of the jury treason (Tit. 14, § 424), murder in the first degree (Tit. 14, § 318), rape (Tit. 14, § 395), carnal knowledge of any female over fourteen years of age by administering any substance which prevents an effectual resistance (Tit. 14, § 397), carnal knowledge of any female under twelve years of age (Tit. 14, § 398), carnal knowledge of a married woman by falsely impersonating her husband (Tit. 14, § 400), robbery (Tit. 14, § 415), kidnapping for ransom (Tit. 14, § 7), attempted kidnapping (Tit. 14, § 8), first degree arson (Tit. 14, § 23), second degree arson (Tit. 14, § 24), first degree burglary (Tit. 14, § 85), and exploding dynamite near an occupied dwelling (Tit. 14, § 123).
No person has been punished capitally in Alabama since William F. Bowen, Jr. was executed for the brutal stabbing murder of Janice Clower Thomas, a twenty-seven-year-old white female. Bowen, a white male, age thirty, worked for the Home Pest Control Company in Huntsville, Alabama, and visited the victim's home on a work order. Upon entering the victim's residence, he forced her into a bedroom and ordered her to remove her clothes. Bowen testified that he intended to rape the victim but felt ashamed and changed his mind. When he started to leave the home, the victim attempted to use a phone and call the police. Bowen reacted by grabbing a rolling pin and beating the victim about the head until she was unconscious. He then secured a butcher knife from the kitchen and proceeded to stab the victim fourteen times. An autopsy revealed that the victim had been stabbed three times in the chest, six times in the back and five times in the neck. The knife was found in the body protruding from the neck. At the time of the homicide, the victim's two children, a two-year-old boy and a four-month-old girl, were asleep in their bedrooms. The victim's body was discovered by her husband when he returned home from work in the early evening. Bowen was convicted of the murder in late 1961, and executed in September of 1965.
The history of the death penalty in Alabama shows without question that throughout the state's history, the legislature has authorized the death penalty for the intentional killing of another. During part of that history, slaves and free Negroes were singled out for different treatment, but those racially based laws were abrogated over 100 years ago, and from that time until the decision in Furman, the type of crimes for which the death penalty could be given did not significantly change.
We do not have available to us any statistics which would indicate the number and frequency with which the death penalty was imposed during the period after the Civil War and prior to Furman, but we have examined some of the capital cases which were pending at the time Furman was decided. We examined these cases to determine whether the death penalty may have been imposed in an arbitrary or capricious manner. We were especially interested in determining whether racial discrimination may have been present.[2]
Our research of the convictions prior to the Furman decision for which defendants were awaiting execution at the time of *653 Furman brought certain relevant statistics to light. In our research we examined the convictions of the 23 persons who were on death row in Alabama at the time of Furman.
We reviewed those 23 cases to determine the nature of the offense for which those defendants received the death penalty, the race of the defendants and the race of the victims, primarily to determine the profile of defendants selected for the capital penalty, and to determine, if we could, whether racial discrimination might have infected the jury verdicts in those cases. Even though the available data which we reviewed is not sufficient to support a definite conclusion on our part, we are of the opinion that the data we reviewed, if it shows anything, shows that pre-Furman juries may have exercised their "untrammelled discretion" on a racial basis in cases of rape involving a black defendant and a white victim. Excluding those rape cases, however, and basing our opinion on an examination of the data we have available, we cannot reach any conclusion whether racial discrimination infected the jury verdicts in any of the remaining cases, but we include that data which we did review.[3]
Given the fact that racial bias in the trial and sentencing process may have influenced some past convictions, any improper practice of the past should not affect the present application of the death penalty under the guidelines we set out in this opinion.[4]
The possibility of racial or other bias in the trial or sentencing process has greatly diminished in Alabama in the last several years. To begin with, the entire judicial system was revamped and Alabama is now recognized nationally as having one of the best judicial systems in the nation. The Death Penalty Act was passed by a legislature which was reapportioned under a federal court order which insured representation of minorities by a wholesale redistricting of the state. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Furthermore, Alabama has adopted a Jury Selection Act which declares, as policy, "that all persons selected for jury service be selected at random from a fair cross section *654 of the population of the area served by the court, and that all qualified citizens have the opportunity, in accordance with this article, to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose." Code 1975, § 12-16-55. Discrimination in jury selection is specifically prohibited. Code 1975, § 12-16-56.
Finally, the procedural changes mandated by this opinion will further decrease the likelihood that a sentence of death will be imposed in an arbitrary or capricious manner.

RESPONSE TO FURMAN
This Court's response to Furman was to commute the death sentences to life imprisonment for all defendants who had been convicted under a sentencing scheme which permitted jury discretion. Typical of the manner in which this Court handled those cases is the procedure set forth in Hubbard v. State, 290 Ala. 118, 274 So.2d 298 (1973), (first degree murder), and Swain v. State, 290 Ala. 123, 274 So.2d 305 (1973), (rape).
The Alabama legislature's response to Furman was the passage of Alabama's Death Penalty Statute. Act No. 213, Reg. Sess. of 1975, Acts of Alabama, p. 701, approved September 9, 1975.

CASES TRIED UNDER ALABAMA'S NEW DEATH PENALTY STATUTE
Having reviewed the operation of Alabama's death penalty law prior to Furman, we deem it appropriate to consider the cases tried under the post-Furman law to compare the cases of defendants who received the death penalty and to attempt to ascertain whether the juries acted arbitrarily, capriciously or freakishly.[5]
Pre-Furman and post-Furman statistics do not vary substantially if compared as to type of offenses, race of defendant and race of victim. Pre-Furman and post-Furman statistics do vary in one respect. There is an increase in the total number of persons sentenced to death when compared with the number of death row inmates at the time of Furman, but this increase in death sentences could very well be due to the alarming increase in crime in recent years. As Justice Powell noted in his dissenting opinion to Furman v. Georgia, 408 U.S. 238, 414, 92 S.Ct. 2726, 2816, 33 L.Ed.2d 346 (1972), joined by Chief Justice Burger, Justice Blackmun and Justice Rehnquist:
It is true that the sentencing rate might be expected to rise, rather than remain constant, when the number of violent crimes increases as it has in this country.
408 U.S. at 441, 92 S.Ct. at 2830.
We have examined the operation of Alabama's Death Penalty Act conscious that many of the defendants who have been sentenced under the Act may request new trials based upon the result we reach in this case; therefore, further comment and comparison at this stage would not be appropriate. Some of the defendants, under the procedure we adopt in this opinion, may not receive the ultimate penalty. In any event, we find no indication that the Act itself has allowed racial discrimination to infect the sentences given under it.
Defendants tried and convicted under the Act and sentenced to death include blacks *655 and whites, one woman and one juvenile (who was tried as an adult). A total of 61 victims suffered death in these cases. Those victims include blacks and whites, rich and poor, young and old, male and female.
The foregoing analysis is for the purpose of illustration only. Many of the death cases may have to be retried and we should not be understood here as holding that either the conviction or death penalty was appropriate in each of the cases. The correctness of the imposition of the sentence of death in any case already tried and in any case which may be tried or retried will necessarily have to be resolved in each individual case by using the guidelines set forth in this opinion.
With the foregoing historical perspective, and using the taillights of the most recent decisions from the Supreme Court of the United States on this issue, we now proceed to a discussion of the specific issue presented in this case, viz.: whether this Court can, or should, sever those portions of the statute which the Supreme Court of the United States has determined to be unconstitutional.
The Attorney General argues that the "preclusion clause" in § 13-11-2(a) ("... and which offenses so charged with said aggravation shall not include any lesser offenses...") should be severed, because "the only reason the legislature put the preclusion clause in this statute was the erroneous belief that the constitution required it...." The Attorney General also argues that the requirement that the jury "shall fix the punishment at death" which is contained in § 13-11-2(a), should be severed because "[w]ithout the preclusion clause, the verdict form is unconstitutional."
We agree with the Attorney General that the preclusion clause can be severed, but we cannot agree that the legislative determination to make the jury a part of the sentencing scheme can be severed.
We begin our analysis of the Alabama statute in view of the mandate in this case, not with complete confidence because some of the decisions in these death penalty cases are quite confusing. We have read cases decided before Furman, and we have read very closely the post-Furman cases. We perceive that the following principles are applicable in death cases:
(1) Capital punishment is not unconstitutional per se. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); it is a legislative choice, not a judicial one.[6]
(2) A mandatory sentence of death upon conviction of a particular offense is generally unconstitutional. Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The Supreme Court has not yet decided whether a mandatory sentence is appropriate in certain very limited circumstances. Woodson, 428 U.S. at p. 287, n. 7, 96 S.Ct. at p. 2983, n. 7.
(3) A discretionary death statute, in which the jury is given complete and unreviewable discretion, unguided by any standards as to whether the death penalty is appropriate, is unconstitutional. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); contra, McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971).
(4) A mandatory death penalty statute which requires a judge to give a lesser *656 included offense instruction whether or not it was justified by the evidence is unconstitutional, when the procedure would empower the jury to exercise discretionary sentencing authority. Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), (Opinion of Stewart, Powell and Stevens, JJ.).
(5) A statute which precludes a judge from instructing a jury on lesser included offenses, even though a lesser included offense is supported by the evidence, is unconstitutional. Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).
(6) "Where guilt is determined separately from punishment, there is little risk that the jury will use its power to decide guilt to make a de facto punishment decision." Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).
(7) Appellate review of death cases is required to make sure that the death penalty will not be wantonly or freakishly imposed. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
(8) There are some offenses, like rape, for which the sentence of death is disproportionate to the crime, and is, therefore, unconstitutional. Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).
With these principles of law relative to the imposition of capital punishment clearly in mind, we how address Alabama's Death Penalty Act to determine whether it can be salvaged by severing the preclusion clause and adopting a procedure which would preserve the legislative requirement that the jury fix the punishment at death if it finds the accused guilty of a capital offense. We conclude that the Alabama Death Penalty Act can be upheld.

LEGISLATURE INTENDED TO PASS A CONSTITUTIONAL LAW
That the legislature intended to pass a death penalty law is not open to serious question. The Supreme Court of the United States, in Gregg v. Georgia, supra, listed Alabama as one of the states which had enacted a death penalty statute after Furman. See, Gregg v. Georgia, 428 U.S. at p. 179, 96 S.Ct. at p. 2928. The Supreme Court of the United States, as a matter of fact, seemingly recognized, in this case, that the problem with the Alabama statute was that the Alabama Legislature had, in adopting the preclusion clause, misread Furman. We conclude that the Alabama Legislature did, in fact, misread Furman, but that it was in good company! As the Supreme Court of the United States states in Beck, 100 S.Ct. at p. 2390:
... In response to Furman, several states enacted statutes that purported to withdraw any and all discretion from the jury with respect to the punishment decision by making the death penalty automatic on a finding of guilt....
Some legal writers who examined Furman, without the benefit of the later cases, concluded that a mandatory death statute was a viable alternative. See, Vance, The Death Penalty After Furman, 48 Notre Dame Law. 850 (1973); Comment, Furman v. Georgia; A Post Mortem on the Death Penalty, 18 Villanova L.Rev. 678 (1973); Comment, The Death PenaltyThe Alternatives Left After Furman v. Georgia, 37 Albany L.Rev. 344 (1973).
The setting in which the Alabama Death Penalty Statute was enacted must be considered. Furman had invalidated Alabama's pre-Furman statute, and the legislature did not have the benefit of the belated wisdom of the post-Furman capital punishment decisions. The Alabama legislature had only the Furman decision as guidance, and the confusion caused by the Furman decision is legendary. As the Supreme Court of the United States itself noted:
Predictably, the variety of opinions supporting the judgment in Furman engendered confusion as to what was required in order to impose the death penalty in accord with the Eighth Amendment.
Lockett v. Ohio, 438 U.S. 586, 599, 98 S.Ct. 2954, 2962, 57 L.Ed.2d 973 (1978) (plurality opinion) (footnotes omitted); accord, Woodson v. North Carolina, 428 U.S. 280, 317, 96 S.Ct. 2978, 2997, 49 L.Ed.2d 944 (Rehnquist, *657 J., dissenting, remarked that for state legislatures to respond to the concerns of Furman was "not an easy task considering the glossolalial manner in which those concerns were expressed"); Furman v. Georgia, 408 U.S. at 461, 92 S.Ct. at 2839 (Powell, J., dissenting, referred to "the cloudily outlined views" of three Justices whose views were essential to that decision). The Supreme Court was forced to admit when it held unconstitutional a provision of the Ohio capital punishment statute which had been enacted to comply with Furman, that: "The signals of this Court have not, however, always been easy to decipher." Lockett v. Ohio, 438 U.S. at 602, 98 S.Ct. at 2963 (plurality opinion); accord, id., at 599 n. 7, 98 S.Ct. at 2962 n. 7. Justice Rehnquist stated the problem this way:
... [T]he Court has gone from pillar to post, with the result that the sort of reasonable predictability upon which legislatures, trial courts, and appellate courts must of necessity rely has been all but completely sacrificed.
438 U.S. at 629, 98 S.Ct. at 2973 (dissenting opinion).
None of the nine opinions in Furman offered any specific guidance on how a state legislature could enact a capital punishment statute that met constitutional requirements, but the opinion of the Chief Justice, at least, implied that preclusion of lesser included offenses might be necessary. Furman v. Georgia, 408 U.S. at 401, 92 S.Ct. at 2809 (Burger, C. J., dissenting). It is also interesting to note that the three statutes upheld by the Supreme Court in 1976 were all attacked as unconstitutional because they did not preclude lesser included offenses. See, Gregg v. Georgia, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976) (plurality opinion); Proffitt v. Florida, 428 U.S. 242, 254, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976) (plurality opinion); Jurek v. Texas, 428 U.S. 262, 274, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976) (plurality opinion). As it turned out, the Florida, Georgia and Texas legislatures guessed right, and the Alabama legislature guessed wrong. Alabama's was not the only legislature to guess wrong on the preclusion issue. The Mississippi legislature also enacted a post-Furman statute which precluded lesser included offenses. See, Beck v. Alabama, 100 S.Ct. at 2388 n. 10; Jackson v. State, 337 So.2d 1242, 1255 (Miss.1976) (striking and severing the preclusion clause from the remainder of the capital punishment statute).
The remainder of the Alabama Capital Punishment Statute is complete within itself, sensible, and capable of execution after the preclusion clause is stricken. Absent the fourteen words which constitute the preclusion clause, the long established Alabama statutory and common law rule will apply so that juries in capital cases will be instructed on any lesser included offenses supported by the evidence. That rule applies in every state in this country, see, Beck v. Alabama, 100 S.Ct. at 2388-2389 n. 12; it was the rule in every case tried in Alabama for more than a hundred years before Furman; it is still the rule in non-capital cases tried in Alabama, see, Beck v. Alabama, 100 S.Ct. at 2385 n. 5, 2388-2389; and it would unquestionably have been the rule in Alabama's post-Furman capital cases had the Alabama legislature not misinterpreted Furman.
Because of the setting within which the legislature was acting, it is only reasonable to conclude that the only reason the legislature put the "preclusion clause" in the statute was the erroneous belief that the Constitution of the United States, as interpreted in Furman, required it. It is obvious to us that had the legislature perceived that the "preclusion clause" would be held unconstitutional, it would not have adopted the clause. In any event, the legislature added a severance provision to the act.[7]
*658 The guiding star in severability cases is legislative intent. In A. Bertolla & Sons v. State, 247 Ala. 269, 271, 24 So.2d 23 (1945), this Court stated:
One of the tests used to determine whether an act is or is not severable, so that a portion may be rejected, is that it ought not to be held wholly void unless the invalid portion is so important to the general plan and operation of the law in its entirety as reasonably to lead to the conclusion that it would not have been adopted if the legislature had perceived the invalidity of the part so held to be unconstitutional. Where the valid and invalid parts are so bound together that the invalid part is a material inducement to the valid portion, the whole is invalid. Union Bank & Trust Co. v. Blan, 229 Ala. 180, 155 So. 612, and cases cited; 6 Ruling Case Law page 125, section 123. [Emphasis added.]
Another principle of severability is stated in Wilkins v. Woolf, 281 Ala. 693, 697, 208 So.2d 74 (1968), as follows:
Another guiding principle of paramount importance is that courts seek to sustain, and not strike down, the enactments of a coordinate department of government. Every legislative act is presumed to be constitutional and every intendment is in favor of its validity. Tucker v. State, 231 Ala. 350, 165 So. 249; Gray v. Johnson, supra [235 Ala. 405, 179 So. 221]. Although a statute may be invalid or unconstitutional in part, the part that is valid will be sustained where it can be separated from that part which is void. State ex rel. Farmer v. Haas, 239 Ala. 16, 194 So. 395. If after the deletion of the invalid part, the remaining portions of an Act are complete within themselves, sensible, and capable of execution, the Act will stand notwithstanding its partial invalidity. Springer v. State ex rel. Williams, 229 Ala. 339, 157 So. 219.
Certainly the existence of a severability clause in the Act itself cannot but strengthen this principle.
The presence of a severability clause in the death penalty statute has some significance. As Mr. Justice Beatty stated for a unanimous court in Comer v. City of Mobile, 337 So.2d 742 (Ala.1976):
... Such a clause is persuasive authority that the Legislature intended the valid portion to survive. Mitchell v. Mobile County, 294 Ala. 130, 313 So.2d 172 (1975).
In Opinion of the Justices, 284 Ala. 626, 628-629, 227 So.2d 396 (1969), this Court held that:
It is a well-established rule in this State that a severability clause should be given effect where possible in order to save a legislative enactment. Allen v. Walker County, 281 Ala. 156, 199 So.2d 854; Wilkins v. Woolf, 281 Ala. 693, 208 So.2d 74; San Ann Tobacco Co. v. Hamm, 283 Ala. 397, 217 So.2d 803. Such a clause or provision in an act is to be given its full scope and effect. Shuttlesworth v. Birmingham Bd. of Ed. of Jefferson County, Alabama [D.C.], 162 F.Supp. 372, affirmed 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145.
Applying these principles to this case, we conclude that severance of the preclusion clause will not leave the remainder of the statute meaningless, because without preclusion, the Alabama rule concerning lesser included offenses will apply so that juries in capital cases will be instructed on each lesser included offense which has any basis in the evidence. As we noted previously, that is the rule which *659 applies in every state in this country and in the federal courts, and will henceforth be the rule in Alabama in capital cases.

THE JURY VERDICT FORM REQUIREMENT
The verdict form requirement is contained in § 13-11-2(a), which provides that:
If the jury finds the defendant guilty, it shall fix the punishment at death....
Section 13-11-2(c) recognizes the possibility that the jury may fail to agree "on the fixing of the penalty of death," and provides that the court may declare a mistrial if such a contingency occurs. Section 13-11-3 provides for a sentence hearing if the jury finds the defendant guilty of a capital offense and "fixes the punishment at death."
The requirement that the jury fix the punishment at death if it finds the defendant guilty of a capital offense is in no way binding on the trial court as the final sentencing authority. This is made clear by the first sentence of § 13-11-4, wherein it is provided that, "notwithstanding the fixing of the punishment at death by the jury...," the court, following the sentence hearing and after weighing the aggravating and mitigating circumstances, may sentence the defendant to life imprisonment without parole instead of death. As this Court, the Court of Criminal Appeals, and the federal courts have all held, under Alabama's statute the trial court judge and not the jury is the sentencing authority. Jacobs (Jerry Wayne) v. State, 361 So.2d 640, 644 (Ala.1978) ("In Alabama, the jury is not the body which finally determines which murderers must die and which must not."), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979); Beck v. State, 365 So.2d 985, 1001 (Ala.Cr.App.), aff'd, 365 So.2d 1006 (Ala.1978), rev'd, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); Evans v. Britton, 472 F.Supp. 707, 718 (S.D.Ala.1979), rev'd on other grounds, 628 F.2d 400 [5th Cir. 1980].
While the jury is not the final sentencing authority under the capital sentencing scheme set out in the statute, the requirement that the jury fix the punishment was deliberately included in the statute by the legislature. Applying the same principles of severability which we applied to the preclusion clause, we arrive at a different conclusion with regard to the jury verdict requirement. We cannot sever that clause, because we believe that the legislature intended to have jury input in the sentencing process. Throughout Alabama's history, juries have always played a major role in capital cases and we are not convinced that a state could constitutionally eliminate jury participation in the sentencing process, although the State argues otherwise as follows:
Capital defendants are still arguing that Alabama's statute is unconstitutional because it does not provide for jury input into the sentencing decision, but all the precedents establish that jury participation in the sentencing process is not required. Lockett v. Ohio, 438 U.S. 586, 633 [98 S.Ct. 2954, 2975, 57 L.Ed.2d 973] (1978) (dissenting opinion of Rehnquist, J.); Richmond v. Arizona, 434 U.S. 1323 [98 S.Ct. 8, 54 L.Ed.2d 34] (1977) (opinion of Rehnquist, J., as Circuit Justice); Jacobs (Jerry Wayne) v. State, 361 So.2d 640, 646 (1978) (opinion of Torbert, C. J.), cert. denied, 439 U.S. 1122 [99 S.Ct. 1034, 59 L.Ed.2d 83] (1979); Beck v. State, 365 So.2d 985, 1001 (Ala.Cr.App.), aff'd. 365 So.2d 1006 (Ala.1978), rev'd on other grounds [447 U.S. 625], 100 S.Ct. 2382 [65 L.Ed.2d 392] (1980); State v. Simants, 197 Neb. 549, 559, 250 N.W.2d 881, 888, cert. denied, 434 U.S. 878 [98 S.Ct. 231, 54 L.Ed.2d 158] (1977); State v. Richmond, 114 Ariz. 186, 560 P.2d 41 (1976), cert. denied, 433 U.S. 915 [97 S.Ct. 2988, 53 L.Ed.2d 1101] (1977); see, Proffitt v. Florida, 428 U.S. 242, 252 [96 S.Ct. 2960, 2966, 49 L.Ed.2d 913] (1976) (joint opinion) (`it has never been suggested that jury sentencing is constitutionally required'); Gregg v. Georgia, 428 U.S. 153, 192 [96 S.Ct. 2909, 2934, 49 L.Ed.2d 859] (1976) (joint opinion) (flaws in jury sentencing).
*660 The legislature has included jury participation in the sentencing scheme; therefore, we cannot judicially sever it even if it might not be required constitutionally.
The next question is whether severance of the preclusion clause would make the verdict form requirement unconstitutional. The State thinks so. The Attorney General states:
Without the preclusion clause, the verdict form requirement is unconstitutional. Absent preclusion, the apparently mandatory nature of the death penalty would lead at least some juries to exercise de facto sentencing discretion and cause them to improperly convict defendants who were actually guilty of capital offenses of nothing more than a lesser included offense.
We agree with the Attorney General that if the jury is permitted to determine guilt at the same time it also is required to make its punishment decision, that the jury could use its power to decide guilt to make a de facto punishment decision. The solution to this problem cannot be effected by the elimination of the jury's participation in the sentencing process, but it can be effected by a bifurcation of the proceedings. As the Supreme Court noted in this case:
... [W]here guilt is determined separately from punishment, there is little risk that the jury will use its power to decide guilt to make a de facto punishment decision.
Beck v. Ala., 447 U.S. at 641 n. 17, 100 S.Ct. at 2391 n. 17 (1980), quoting Gregg v. Georgia, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (opinion of Stewart, Powell and Stevens, JJ.).
Because the legislature has provided for jury participation in the sentencing scheme, before this jury participation can comport with constitutional requirements, certain procedures must be followed by the trial court.
The statutory requirement that the jury "shall fix the punishment at death" if the jury finds the defendant guilty of a capital offense is mandatory in nature even though the jury is not the sentencing authority under Alabama's death penalty law, as we have already pointed out; however, the requirement that the jury mandatorily fix the punishment at death, even at a bifurcated proceeding, would be open to a constitutional challenge. The Attorney General recognizes this and wants the jury verdict requirement severed. To sever the jury verdict requirement, in our opinion, would not carry out legislative intent; however, since we conclude that the dominant intent of the legislature was to pass a constitutional death penalty law, we may now construe the requirement that the jury fix the penalty at death to be permissive instead of mandatory. By doing this we carry out legislative intent to pass a constitutional death penalty statute. Cf. Jackson v. State, 337 So.2d 1242 (Miss.1976), cited in Beck v. Alabama, supra.
We, therefore, construe the requirement in § 13-11-2(a), that the jury "shall fix the punishment at death" to be permissive and to mean that the jury cannot fix punishment at death until it takes into account the circumstances of the offense together with the character and propensity of the offender, under sentencing procedures which will minimize the risk of an arbitrary and capricious imposition of the death penalty.
The procedures we establish in this case are substantially those set out by the Supreme Court of the United States in Gregg v. Georgia, supra, wherein the Court noted that "[j]ury sentencing has been considered desirable in capital cases ..." and that "... a bifurcated system is more likely to insure elimination of the constitutional deficiencies identified in Furman."
In Gregg, the court said:
While Furman did not hold that the infliction of the death penalty per se violates the Constitution's ban on cruel and unusual punishments, it did recognize that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice. Because of the uniqueness of the death penalty, Furman held that it could not be *661 imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. ...

Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

It is certainly not a novel proposition that discretion in the area of sentencing be exercised in an informed manner. We have long recognized that "[f] or the determination of sentences, justice generally requires ... that there be taken into account the circumstances of the offense together with the character and propensities of the offender." Pennsylvania v. Ashe, 302 U.S. 51, 55 [58 S.Ct. 59, 60, 82 L.Ed. 43] (1937). See also Williams v. Oklahoma, 358 U.S. 576, 585 [79 S.Ct. 421, 426, 3 L.Ed.2d 516] (1959); Williams v. New York, 337 U.S. 241, 247 [69 S.Ct. 1079, 1083, 93 L.Ed. 1337] (1949). Otherwise, "the system cannot function in a consistent and rational manner." ... If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision.

* * * * * *

Jury sentencing has been considered desirable in capital cases in order "to maintain a link between contemporary community values and the penal systema link without which the determination of punishment could hardly reflect `the evolving standards of decency that mark the progress of a maturing society.'" But it creates special problems. Much of the information that is relevant to the sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question. This problem, however, is scarcely insurmountable. Those who have studied the question suggest that a bifurcated procedure one in which the question of sentence is not considered until the determination of guilt has been madeis the best answer. ...

* * * * * *
When a human life is at stake and when the jury must have information prejudicial to the question of guilt but relevant to the question of penalty in order to impose a rational sentence, a bifurcated system is more likely to ensure elimination of the constitutional deficiencies identified in Furman.

Gregg, supra, at 428 U.S. 188-192, 96 S.Ct. 2932-2934 (1976). (Emphasis added).
The procedural steps necessary in a death case are not spelled out in Alabama's Death Penalty Act. Had Furman been specific in its mandate, the state legislature and courts could have followed the mandated requirements. They have done so in other cases. Cf. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1960). The legislature misread the requirements of Furman but misreading of Furman is not ground for invalidation of the legislature's effort to pass a constitutional act. This Court, having determined that the dominant intent of the legislature was to pass a constitutional death penalty law, is not powerless to prescribe rules of procedure to be followed in capital cases under the inherent power granted this Court in the Judicial Article. Amendment 328, Constitution of Alabama.
Without question, the legislature has spelled out specifically what offenses it considers to be capital offenses. The Alabama legislature has substantially followed the Model Penal Code in describing with specificity those offenses which are deemed capital offenses. Code 1975, § 13A-5-31. *662 Each of the fourteen crimes specified requires an intentional killing with aggravation, and not some crime other than homicide under aggravated circumstances. Horsley v. State, Ala.Cr.App., 374 So.2d 363 (1978); aff'd, Horsley v. State, Ala., 374 So.2d 375 (1979). Any holding by this or any other court which is contrary to the holding we make today, is overruled.[8] Under the separation of powers doctrine, this Court cannot change the offense, but a change in procedure to comport with constitutional requirements is not impermissible. In Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), the Supreme Court of the United States rejected an argument that a procedural change in the method of sentencing to conform to Furman requirements was ex post facto. The legislature has adopted the sentencing scheme and has required jury participation. What we do is to adopt a rule whereby that scheme will comport with constitutional requirements.

TRIAL AND SENTENCING PROCEDURES REQUIRED
We now hold that all trials conducted under Alabama's Death Penalty Act shall be as follows: a guilt-finding phase and, if the defendant is found guilty, a sentence-determining phase.
The central issue in the guilt phase of the trial will be whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime.[9] In the event the defendant is found guilty of the capital offense, the sentencing procedures hereinafter outlined shall apply. If the defendant is found guilty of some lesser included offense, the sentencing procedures for non-capital cases, applicable at the time the offense was committed, shall apply. Code 1975, § 13A-1-7, § 13A-5-1; Alabama Rules of Criminal ProcedureTemporary Rules 1-11.
The central issue at the sentencing phase of the trial, in the event the defendant is found guilty of the capital offense as charged, will be the "circumstances of aggravation and of mitigation that should be weighed and weighed against each other...." Gregg, 428 U.S. 153 at 193, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859. In short, a capital jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.
In Woodson v. North Carolina, 428 U.S. at 304, 96 S.Ct. at 2991 (1976), the Court said:
A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.
In Jurek v. Texas, 428 U.S. at 271, 96 S.Ct. at 2956 (1976), the Court stated:

*663 ... [A] sentencing system that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination that we today have held in Woodson v. North Carolina, [428 U.S. 208], at 303-305, 96 S.Ct. 2978 [at 2990-2992], 49 L.Ed.2d 944 to be required by the Eighth and Fourteenth Amendments. For such a system would approach the mandatory laws that we today hold unconstitutional in Woodson and Roberts v. Louisiana, [428 U.S.] p. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974. A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.
Thus, in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances....
The Court, in Gregg v. Georgia, 428 U.S. at 193, 96 S.Ct. at 2934 (1976), noted:
While some have suggested that standards to guide a capital jury's sentencing deliberations are impossible to formulate, the fact is that such standards have been developed. When the drafters of the Model Penal Code faced this problem, they concluded "that it is within the realm of possibility to point to the main circumstances of aggravation and of mitigation that should be weighed and weighed against each other when they are presented in a concrete case." Model Penal Code § 201.6, Comment 3, p. 71 (Tent. Draft No. 9, 1959) (emphasis in original). While such standards are by necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary....

WHAT AGGRAVATING AND MITIGATING CIRCUMSTANCES WILL THE JURY WEIGH?
In Alabama, the aggravating circumstances constitute an element of the capital offense and are required to be "averred in the indictment" (Code 1975, § 13-11-2), and must be proved beyond a reasonable doubt. Consequently, the jury verdict that the defendant was guilty of committing the capital offense would mean that the State had already established at least one aggravating circumstance, even though the legislature did not include an aggravating circumstance in § 13-11-6 to correspond with the "aggravation" made a part of each capital offense by § 13-11-2(a). In addition, the State would be permitted to offer evidence of any other aggravating circumstance contained in § 13-11-6, which was not "averred in the indictment" but which was proved beyond a reasonable doubt at trial or by the evidence taken at the sentencing hearing. The jury would weigh the one or more aggravating circumstances found to exist in the case in determining whether to impose the death penalty. At the sentencing hearing before the jury, the court must permit the defendant to introduce any matter relating to any mitigating circumstances including those enumerated in Code 1975, § 13-11-7. At the sentencing hearing, following the presentation of evidence of aggravating and mitigating circumstances, the prosecutor and defense counsel shall be given an opportunity to argue for and against respectively the imposition of the death penalty in the individual case.
The court shall instruct the jury that in determining whether to fix a punishment of death, the jury must weigh the aggravating and mitigating circumstances in determining whether to fix the punishment at death. The trial court shall instruct the jury to avoid any influence of passion, prejudice or other arbitrary factor while deliberating and fixing the sentence.
If the jury cannot agree on a sentence of death, the defendant shall be sentenced to life imprisonment without parole. If the jury fixes the punishment at death, the court shall hold a hearing as mandated by § 13-11-3 and § 13-11-4.

*664 APPELLATE REVIEW
The United States Supreme Court, in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), expressed its approval of Georgia's appellate review process in capital punishment cases. The Georgia procedures require that the appellate court (the State Supreme Court in Georgia) review every death sentence to determine (1) whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether the evidence supports the findings of a statutory aggravating circumstance; and (3) whether the sentence as imposed is excessive or disproportionate in relation to the penalty imposed in similar cases, considering both the crime and the defendant.
The procedure we adopt requires that the reviewing court examine cases in which the death penalty is imposed and ascertain that the death penalty is imposed with some uniformity and that its imposition is not substantially out of line with sentences imposed for other acts. In other words, the reviewing court should not affirm a death sentence unless the death penalty is being imposed generally in similar cases throughout the state.
In Alabama, a sentence of death is automatically reviewed by the Court of Criminal Appeals and, if affirmed, is then automatically reviewed on petition for certiorari by this Court. Rule 39(k), Alabama Rules of Appellate Procedure, provides:
In all cases in which the death penalty has been imposed, upon review of the opinion of the court of criminal appeals on certiorari, the supreme court may notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner.
This procedure adds one step of review to the Georgia procedure and, therefore, adds one more safeguard to insure that the death sentence is not being imposed arbitrarily or capriciously. Furthermore, ARAP Rule 39(k) provides a "plain error" scope of review applicable to death penalty cases only.
To insure that sentences of death will not be arbitrarily and capriciously imposed, we hold that both the Court of Criminal Appeals and this Court should examine all death sentences in light of the standards and procedure approved in Gregg. Each death sentence should be reviewed to ascertain whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant. In making this final determination, the courts should examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any.
Based on the foregoing, and pursuant to the mandate from the Supreme Court of the United States, the judgment of the Court of Criminal Appeals which affirmed Beck's conviction and sentence of death is reversed and this cause is remanded with directions that the Court of Criminal Appeals remand the cause to the trial court for proceedings not inconsistent with the requirements of law as set forth in this opinion.
REVERSED AND REMANDED WITH DIRECTIONS.
TORBERT, C. J., and FAULKNER, JONES, ALMON, SHORES, EMBRY and BEATTY, JJ., concur.
ADAMS, J., concurs specially.
ADAMS, Justice (concurring specially):
In all candor, I have struggled with the problem of writing one single line addressing the issues involved in this history making case for the State of Alabama. I had many avenues of escape. First, the case had been orally argued and submitted eleven days before I was sworn in on October *665 17, 1980,[1] as the first black Alabama Associate Supreme Court Justice. Second, within the constraints of time, it was almost impossible for me to digest all of the material presented in this case and faithfully perform my responsibilities regarding other cases. Third, my brothers and sister on the bench had a more intimate acquaintance with the case, having heard it on certiorari to the Court of Criminal Appeals and having exchanged views in conference on many occasions prior to oral argument. Finally, I was intimately acquainted with the issues involved in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), by virtue of participation as lead counsel in Butler v. State, 285 Ala. 387, 232 So.2d 631 (1970), cert. dismissed, 406 U.S. 939, 92 S.Ct. 1807, 32 L.Ed.2d 140 (1972); Billingsley v. State, 287 Ala. 634, 254 So.2d 333 (1971); and, Liddell v. State, 287 Ala. 299, 251 So.2d 601 (1971). These cases arose from the same county as Beck and involved the same district attorney; furthermore, I raised virtually every issue raised in Furman.
For me, however, escape was impossible because of the commitment I had made at the time of my assumption of this position, that I would place my imprimatur, no matter how perfect or imperfect, on every case that it was my responsibility to participate in. I further promised that I would bring the totality of my 33 years of experience as a practicing lawyer to bear on each decision.
I, as well as many others, have come 180 degrees in my thinking since our arguments in the early seventies that the death penalty was unconstitutional because it was irrevocable, served no useful purpose,[2] was excessive,[3] and offended a sense of human dignity,[4] but mainly because it was discriminatorily applied against minorities and the economically deprived in our society.[5] This is not to say, by any means, that prejudice has vanished from the face of this nation or this State. It is to say, however, that the sweeping pronouncement that the death penalty is a violation of the 8th and 14th amendments to the Constitution is not needed as it was at the time Furman was argued, when few blacks served on juries, there were no black public officials or members of the State House of Representatives or Senate and no black judges served in city, state or federal courts.
Today, because of jury discrimination suits I participated in, along with other civil rights lawyers, in every county in Alabama where a meaningful impact could be shown, and because of the adoption of the Jury Selection Act, 1978 Ala. Acts (codified at Code 1975, § 12-16-55, et seq.), blacks are serving in substantial numbers as jurors and meting out stiff sentences, including death. This is because, although in some instances blacks may be the perpetrators of crime, in even more substantial numbers, they are the victims of crime.
Presently, the mayor of Alabama's largest city is black, and the mayors of other large cities are black. Blacks are serving in meaningful numbers in Alabama's state legislature. They are police officers, as well as deputy sheriffs. They are represented on the city, probate, district circuit, supreme court and federal benches.
One common thread runs through most of the decisions dealing with capital punishment. That thread is that the "cruel and unusual" language of the 8th amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958); Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).
The black man does not wish to be the pet of the law. The more blacks become enmeshed in meaningful positions in our society, then the more that society will become *666 non-discriminatory. His goals and ideals will become identical with goals and ideals of the rest of society. To insist on special treatment, and demand and get integration in other aspects of society is to pursue inconsistent approaches. If a black man is allowed to go as far as his talents will carry him, he will not need special protection from the courts. If he is not, the courts will once again be asked for special protection.
After much soul-searching, I have the abiding feeling that capital punishment does deter crime. It probably does not deter all crimesome murders may be an exception to the rule; but I believe that it deters enough crime that it should not be withheld from the arsenal of weapons of a civilized society to combat crime, without which that society is threatened to become overrun by the lawless among us. The deterrent effect of capital punishment cannot be adequately measured statistically because by definition, once the criminal has been deterred from committing the crime, there is no evidence of crime that can be analyzed statistically.
In the early seventies, blacks argued for bifurcated jury trials, and this Court today has mandated such for the State of Alabama. In the seventies, blacks asked that sentences for rape and other offenses be not discriminatorily and freakishly imposed. The Supreme Court of the United States has determined that capital punishment for rape is disproportionate to the offense;[6] and this Court, today, has built into the judicial machinery checks against the freakish imposition of the death sentence in other cases.
The key issue of the case, of course, is whether our Court can make these changes in Alabama's death penalty statute and escape the objection that we are invading the province of the legislature. Because I believe that the changes made by this Court are procedural and ameliorative, I feel that the changes mandated by the Court are well within constitutional parameters, and comport with the intent and purpose of the legislature in its enactment of the death penalty statute.

ON APPLICATION FOR REHEARING
The State of Alabama and the defendant filed applications for rehearing.
ORIGINAL OPINION MODIFIED; APPLICATIONS FOR REHEARING DENIED.
MADDOX, FAULKNER, ALMON, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.
TORBERT, C. J., and JONES, J., concur specially.
JONES, Justice (concurring specially).
I concur in the result to overrule the applications for rehearing. See, however, my special concurring opinion in Ex parte Kyzer [MS. March 6, 1981], 399 So.2d 330 (Ala.1981).
TORBERT, C. J., concurs.
NOTES
[1] This change probably resulted from nationwide efforts by abolitionists of the death penalty. See, Furman v. Georgia, 408 U.S. 238, 339, 92 S.Ct. 2726, 2777, 33 L.Ed.2d 346, wherein Mr. Justice Marshall states:

One great success of the abolitionist movement in the period from 1830-1900 was almost complete elimination of mandatory capital punishment.
[2] Although Furman is not based upon the disparity of sentences in rape cases, it is suspected that racial discrimination was at the heart of that decision. Under Alabama's Death Penalty Statute, rape, unless the victim is intentionally killed, is no longer a capital offense. In Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the Court held that a sentence of death for rape was disproportionate to the offense. Two of the cases decided at the same time Furman was decided involved rape. (Jackson v. Georgia and Branch v. Texas). The Court did not decide, either in the Jackson or Branch case, that death was a cruel and unusual punishment for rape, although the issue was presented to the Court at that time.
[3] The data we reviewed is included here for informational purposes. The following indicates the number of convictions per type of offense:

Rape, 5
Rape, murder 2
Robbery, murder 5
Burglary, murder 5
First degree murder 4
Multiple homicide 2

For these offenses the statistical breakdown by race of defendant and race of victim is as follows:

Black defendant, black victim 3
Black defendant, white victim 12
White defendant, black victim 0
White defendant, white victim 6
Indeterminable from record 2

Excluding rape offenses, which were then punishable by death but are not now so punishable, the following statistics as to race are applicable:

Black defendant, black victim 3
Black defendant, white victim 7
White defendant, black victim 0
White defendant, white victim 6
Indeterminable from record 2

[4] As was noted by Justice Powell in his dissenting opinion in Furman, quoting a case authored by Justice Blackmun while he was on the Eighth Circuit Court of Appeals:

We do not say that there is no ground for suspicion that the death penalty for rape may have been discriminatorily applied over the decades in that large area of states whose statutes provide for it. There are recognizable indicators of this. But ... improper state practice of the past does not automatically invalidate a procedure of the present....
* * * * * *
A final comment on the racial discrimination problem seems appropriate. The possibility of racial bias in the trial and sentencing process has diminished in recent years. The segregation of our society in decades past, which contributed substantially to the severity of punishment for interracial crimes, is now no longer prevalent in this country. Likewise, the day is past when juries do not represent the minority group elements of the community. The assurance of fair trials for all citizens is greater today than at any previous time in our history. Because standards of criminal justice have `evolved' in a manner favorable to the accused, discriminatory imposition of capital punishment is far less likely today than in the past.
408 U.S. at 450, 92 S.Ct. at 2834.
[5] We researched independently the convictions for which a sentence of death was imposed under Alabama's present Death Penalty Statute, and we also used information furnished by the parties at our request. Based on the information submitted by the parties, wherein fifty of these cases were examined, we find that the following represents a breakdown by offense:

Robbery, intentional killing 33
Intentional killing of two or
 more persons 8
Murder of a law officer 1
Murder when the defendant had
 been convicted of another
 murder within 20 years 3
Murder by explosive device 1
Rape, intentional killing 1
Kidnapping, intentional killing 1
Offense not indicated by the parties 2

Of these fifty convictions, the following represents statistical data based upon the race of the defendant and the race of the victim:

Black defendant, black victim 7
Black defendant, white victim 21
White defendant, black victim 1
White defendant, white victim 21

[6] Were I a legislator, I would vote against the death penalty for the policy reasons argued by counsel for the respective petitioners and expressed and adopted in the several opinions filed by the Justices who vote to reverse these convictions.

* * * * * *
I do not sit on these cases, however, as a legislator, responsive, at least in part, to the will of constituents. Our task here, as must so frequently be emphasized and reemphasized, is to pass upon the constitutionality of legislation that has been enacted and that is challenged. This is the sole task for judges. We should not allow our personal preferences as to the wisdom of legislative and congressional action, or our distaste for such action, to guide our judicial decision in cases such as these. The temptations to cross that policy line are very great. In fact, as today's decision reveals, they are almost irresistible. [Furman v. Georgia, 408 U.S. 238, 445-449 [92 S.Ct. 2726, 2831-2834, 33 L.Ed.2d 346] (1972) (Blackmun, J., dissenting).]
[7] The death penalty statute was enacted as Act No. 213, Reg.Session, Acts of 1975, pp. 701-705, and is now codified as Code 1975, §§ 13-11-1 through 13-11-9 (also §§ 13A-5-30 through 13A-5-38). Section 9 of Act No. 213 provides:

The provisions of this act are severable. If any part of this act is declared invalid or unconstitutional, such declaration shall not affect the part which remains.
Furthermore, Code 1975, § 1-1-16, is an omnibus severability clause. It provides:
If any provision of this Code or any other statute, or the application thereof to any person, thing or circumstances, is held invalid by a court of competent jurisdiction, such invalidity shall not affect the provisions or application of this Code or such amendment or statute that can be given effect without the invalid provisions or application, and to this end, the provisions of this Code and such amendments and statutes are declared to be severable.
Whether the Death Penalty Act is considered as it was originally passed, or as it is now codified, it contains a severability clause.
[8] Clements v. State, 370 So.2d 723 (Ala.1979). Watters v. State, 369 So.2d 1272 (Ala.1979). Jacobs v. State, 371 So.2d 448 (Ala.1979). Whisenhant v. State, 370 So.2d 1080, 1102 (Ala.Cr.App.1979).
[9] The Supreme Court of the United States in this Beck case was concerned about the jury's attention being diverted from the central issue of guilt or innocence. The Court noted:

The closing arguments in this case indicate that under the Alabama statute the issue of whether or not the defendant deserves the death penalty will often seem more important than the issue of whether the state has proven each and every element of the capital crime beyond a reasonable doubt. Thus, in this case, both the prosecutors and the defense attorneys spent a great deal of argument time on the desirability of the death penalty in general and its application to the petitioner in particular, rather than focusing on the crucial issue of whether the evidence showed that the petitioner had possessed the intent necessary to convict on the capital charge.
Beck v. Alabama, 100 S.Ct. at 2392 n. 19 (1980).
[1] I have been able to listen to a tape recording of the argument.
[2] Justice White's position.
[3] Justice Marshall's position.
[4] Justice Brennan's position.
[5] Justice Douglas's position.
[6] Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).