## JACK CARTWRIGHT v. THE STATE.

1. MURDER. *Conviction for manslaughter. Appeal. Immaterial error.*

   Where a trial for murder of a peace officer results in a conviction for manslaughter, this negatives malice or deliberate design to kill, and, on appeal, this court will pass as immaterial an alleged error in the admission of evidence to show such malice or design—as, that defendants had previously killed a man, and were seeking to avoid arrest for the homicide.

2. ARGUMENT. *Improper comments. Objection. Practice.*

   Improper or unwarranted remarks by the prosecuting attorney in his closing argument, not amounting to an extreme and intolerable abuse of the privilege of advocacy, will not cause a reversal of a verdict of guilty, if passed unnoticed at the time, and only objected to on motion for a new trial.

3. JURY. *Murder trial. Improper influence. Reading newspaper reports of trial.*

   Where, during a murder trial, members of the jury procure and read newspapers containing reports of the evidence, accompanied by comments of the reporter unfriendly to the defendant and calculated to excite prejudice against him, it will be ground for setting aside a verdict of guilty and granting a new trial.

4. SAME. *Separation of jury. Effect on verdict.*

   Proof that a juror separated from his fellows during the progress of a murder trial, and, alone, entered a store and called for paper and wrote a

note, will require the setting aside of a verdict of guilty, in the absence of any explanation relieving such misconduct of suspicion.

FROM the circuit court of the first district of Hinds county. HON. J. B. CHRISMAN, Judge.

Jack and Ed Cartwright, *alias* Swanson, were jointly indicted for the murder of Clif Hines, a policeman, in the city of Jackson. The evidence disclosed that the accused had come to Jackson only a few days before the homicide, and had taken up their temporary abode in a vacant and untenantable house in the suburbs of the city. Hines, accompanied by another policeman, Walker Guice, went to the house for the purpose of arresting the Cartwrights as suspicious characters. While at or near the house, both Hines and Guice were shot and killed. The theory of the state was that the Cartwrights fired upon the policemen to avoid arrest, and that the policemen had made no hostile demonstrations evidencing a purpose to fire upon the accused. The theory of the defense was that the policemen fired the first shot, and were shot and killed by appellant, Jack Swanson, acting in self-defense. The evidence as to the circumstances attending the killing was conflicting, there being testimony to support both the contention of the state and that of the defense; but, as the opinion is limited to a consideration of specific errors assigned, it is not necessary to set out all the evidence.

On the trial the state, over the objection of the defendants, introduced evidence to show that defendant, Jack Cartwright, had killed a man in the state of Tennessee about eighteen months before, and that he and his brother, Ed, who was charged with complicity, had been indicted for murder, and had fled from that state. This evidence the court allowed to be introduced as tending to show a probable motive on the part of the accused, and the jury was instructed to consider the evidence only as affecting the question of motive.

In making the closing argument for the state, the prosecuting attorney characterized the accused as murderers and

fugitives from justice, and spoke of their hands being red with the blood of a fellow-man, and the use of this language was made one of the grounds upon which a new trial was asked.

Ed Cartwright was acquitted, but a verdict of guilty of manslaughter was rendered against Jack Cartwright, and he appeals. The opinion contains a further statement of the facts touching the questions decided.

*W. R. Harper* and *C. H. Alexander*, for appellant.

1. The argument of the prosecuting attorney in characterizing accused as murderers and fugitives, whose hands were red with blood, was directly in the face of the instruction that the former killing was evidence only to show a probable motive. Such remarks were peculiarly prejudicial under the facts in evidence. After being made, no objection by the defense could avail. Objection would have merely emphasized the effectiveness of the comment.

2. No evidence was offered by the state to explain the misconduct of the jury in separating. That, with the fact that the jurors perused daily papers containing partisan reports of the trial and comments bitterly hostile to the accused, must necessitate a reversal. Thompson, Merriam on Juries, § 351 and cases cited.

*Frank Johnston,* attorney-general for the state.

1. The comments of the counsel for the state, if improper, were not objected to at the time. Besides, the verdict is so clearly correct, that slight errors should not cause a reversal.

2. I submit that there is no sufficient evidence that the jurors who were in possession of the newspapers read reports of the trial, and were influenced by them. It devolves on the accused to show, not merely a possibility of improper influences being exerted, but that the misconduct of the jury was such that prejudice to the accused must be presumed to have resulted.

WOODS, J., delivered the opinion of the court.

The errors complained of in the first and second assignments, if errors they were, need not be considered. They proved harmless, for the action of the jury in acquitting one of the defendants, and in finding the other guilty of manslaughter, demonstrates that the homicide committed eighteen months before did not furnish, to the mind of the jury, the motive for the homicide charged in this prosecution. Evidently, the jury rejected the state's theory that the killing was murder and that the motive for its commission was to prevent arrest for the prior offense in another state, and so the defendant is left without ground for complaint on this point.

The remarks of the prosecuting attorney were unwarranted and improper, we think, but no objection was interposed, nor any exception taken at the time. Only in the motion for a new trial is any mention to be found in the record of the supposed transgression of the counsel for the state. If counsel go beyond proper bounds in the heat of debate, opposing counsel should then interpose, and have an opportunity given for the correction of the wrong. If such error is suffered to pass unnoticed at the time, it must be a most extreme and intolerable abuse of the advocate's privilege that will receive correction at our hands.

The law was fairly and fully given for the defendant, and we find no error in any action of the court upon the instructions.

The eighth assignment of error is well taken. Some members of the jury, during the progress of the trial, procured copies of a daily newspaper, containing the substance of the evidence of many of the witnesses who testified on the trial, as the same impressed itself upon the mind of the newspaper reporter. It filtered through the medium of a partisan of the state, and was his version of the evidence. This version, too, was accompanied by remarks of the reporter unfriendly to the accused, and well calculated to excite prej-

udice in the mind of a reader. The homicide was character-ized as " the unprovoked murder of two officers while in the discharge of official duty." The defendants were declared to be the possessors " of very unsavory and damaging ante-cedents." This method of communicating to and impress-ing upon the jury, or any member of it, the opinions of others is open to the same condemnation which would be visited upon oral expressions of opinion touching a defend-ant, injected into the body of the jury by some designing in-termeddler. We can see no difference, unless in degree. The widely-read and influential daily journal, speaking for as well as to the public, reflecting popular sentiment as well as making it, must be held to be much more powerful in in-fluencing the average man than any expression of opinion by a single private individual. We know of no reported case in which an outside person has been shown to have talked with the jury, or a member of it, concerning the accused when on trial for a high crime, and especially to have talked unfavorably to and with the jury of the accused, in which the verdict has not been set aside. It seems to us impossible to distinguish between the mischief done by oral and writ-ten or printed communications. In every instance in which improper influences have been brought to bear upon the jury, there will arise the fear that the accused has not had that fair and impartial trial to which he was entitled.

But, in addition to this most reprehensible conduct of the jurors in thus reading the newspaper reports of the evidence adduced, colored necessarily by the feelings of the reporter, it is shown that there was an unwarranted and wholly unex-plained separation of the jurors. On hearing evidence in support of the motion of the prisoner for a new trial, Mr. Eyrich testified that, on one occasion, during the progress of the trial, when the jury passed the door of his business-house, one of the jurors came into his store alone, called for paper and pen, and wrote a note. How long this juror remained away from his fellows nowhere appears. To whom the note

was written, or what were its contents, does not appear. Whether the juror talked with persons in the store or else-where, when he set out to rejoin his fellow-jurors (for we must assume that he did somewhere at some time rejoin them, seeing we find a verdict subsequently rendered), is left to blind conjecture. The state made no effort to show any fact by any witness which would relieve the conduct of the culpable juror of that suspicion which naturally attaches to it; and this, at least, the state was bound to do before its verdict should have been permitted to stand. So long as jurors recklessly disregard the instructions of the trial court (for we unhesitatingly assume that the court did instruct the jury as to its duty to remain together and shun all communi-cation from any source), just so long will this court, in seeing that every person accused of crime has a fair and impartial trial, feel bound to set aside verdicts thus obtained. In all the multiplied cases in our own reports, from Hare's case, in 4 Howard, to Skates' case, in 64 Miss., there is to be found universal and unmeasured condemnation of verdicts open to grave suspicion of unfairness.

We regret the necessity of reversing the judgment, but an imperative sense of duty demands it.

*Reversed and remanded.*