44 So.2d 628

## SEEKERS v. STATE.

### 3 Div. 900.

Court of Appeals of Alabama.
Oct. 5, 1949.

Rehearing Denied Nov. 1, 1949.

Calvin Poole, of Greenville, for appellant.

A. A. Carmichael, Atty. Gen., and L. E. Barton, Asst. Atty. Gen., for the State.

CARR, Judge.

On an indictment charging murder in the first degree the accused was convicted of murder in the second degree.

We will not delineate the tendencies of the evidence nor make any comment thereon, except to say that the appellant admitted he shot and killed the deceased. In justification of his act he claimed self defense. Around this factual issue there appear conflicts in the evidence.

In his motion for a new trial the appellant unsuccessfully sought to have the verdict of the jury set aside on the ground, among others, that the bailiff in charge took the jury to a motion picture show, and this without the knowledge or consent of the court or any other parties participating in the trial of the cause. It appears that this occurred during a night recess of the court and before the taking of the testimony had been completed.

In support of the ground of the motion the movant introduced these affidavits:

"My name is Calvin Poole. I am a practicing attorney of Greenville, Alabama. I represented Archie W. Seekers on the trial of his case in the Circuit Court of Butler County on October 25th and 26th, 1948. I did not give my consent for the bailiff in charge of the jury trying the Seekers case to take the jury to the picture show 'Unconquered' on the evening of October 25th. I did not know that the jury had seen the show until I was told by Mr. Thomas, the deputy sheriff who was in charge of the jury, some time during the day, October 26th. At that time I did not know the nature of the show, and had no idea of its probable prejudicial effect on the minds of the jurors. On the evening of October 26th after the jury had rendered its verdict, I went to see the show myself to determine the nature of the show and its probable effect on the minds of the jurors. I found it to be a very bloody and prejudicial show.

"One of the scenes in the first part of the picture was the trial of the heroine before an English Court in which she was con-victed as an accomplice in the commission of an offense similar to the offense with which the defendant Seekers was charged and sentenced to serve a term of fourteen years in bondage. She was shipped off, with other slaves, to the American Colonies. She was bought by the hero, who, in the progress of the story was court martialed in a dramatic trial and sentenced to be 'shot at sunrise.'

"At one point in the picture, one of the companions of the hero was shot by an Indian and killed. The arrow entered the exact point of the body—just below the left nipple—that had been demonstrated to the jury on my person by the two funeral directors just before the adjournment of the trial on the afternoon of October 25th. The scene was so realistic that I actually flinched when the arrow struck its victim. When he was hit, he fell from his horse and his death agonies were shown in all their terrible and gory details. It was impossible to disassociate the portrayal of the death on the screen from the death of Patterson, the deceased, as related by Mrs. Patterson in the Seekers case.

"In another scene, the wife of one of the leading characters was also shot through the heart, by a gun. Her death was likewise portrayed with all its agonizing suffering; and the blood of the victim flowed from a wound in the same spot on her person as had been portrayed on the witness stand in the Seekers case.

"There were other scenes of death and agonizing suffering calculated to arouse the passion and sympathy of the jury. In one scene, a hut was shown in the clearing, such as might have been imagined from the testimony in the Seekers case. A lonely little puppy was found cringing and whining on the door step. Investigation disclosed that the occupants of the humble little home were not there. Anon, the little dog went off and came back through the crack of the fence carrying a rag doll. The family, including the child, had been massacred and their bodies left for the vultures to devour. The hero dug a shallow grave and buried them while the heroine fashioned a rude cross to mark their last resting place.

"In still another scene, all the occupants of an entire fort were massacred. They were located by the swarm of buzzards flying overhead. All the gory details of their death and mutilation were shown. One old man, apparently about the age of Patterson, the deceased in the Seekers case, had lived in agony three whole days, and was found by the noise of his feeble kicking on the head of a nearby drum to call attention to his pitiful plight. He too died— and the agony of his death was portrayed with all the tragic drama that Mrs. Patterson had portrayed from the witness stand in the recital of the death of her husband in the Seekers case.

"All in all, the picture was of such a nature as to leave in the minds of the jurors the recollection of death, suffering, and sorrow; and to blot all sense of proportion that should govern the mind of a juror in the trial of the defendant who was entitled to have his plea of self defense tried without passion and prejudice."

"My name is Werth W. Thomas. I am Chief Deputy Sheriff of Butler County, Alabama. On the evening and night of October 25th, 1948, I was in custody of the jury that had been drawn and selected and was then engaged in the trial of the case of State of Alabama versus Archie Seekers in the Circuit Court of Butler County. While so in the custody of the jury and without the knowledge or consent (so far as I know) of the defendant or his counsel, I took the jury to the Ritz Theater in Greenville to see the picture show 'Unconquered', starring Gary Cooper and Paulette Goddard. When I took the jury to the show I did not know the nature of the picture and had no intention of doing anything improper. I undertook, with the cooperation of the theater management to keep the jury segregated, but in entering and leaving the theater it was, of course, necessary to mingle with the other patrons to some extent, and some of the jurors were separated from the others while some of them went into the general men's room off from the theater lobby. During the time they were in the men's room I was not with them. What contact they had with other patrons of the show in the men's room I do not know. The jury witnessed the entire showing of the picture 'Unconquered' on the evening of Monday, October 25th, after hearing a portion of the testimony in the Seekers case, and on the morning of Tuesday, October 26th, resumed the trial of the case. I did not have permission from the court to take the jury to the show. It did not occur to me that it was necessary to have such permission."

"My name is Howard Haygood. I am a practicing attorney of the Greenville, Alabama, bar. I saw the moving picture, 'Unconquered', shown at the Ritz Theater in Greenville, Alabama, on Monday and Tuesday, October 25th and 26th. I was not present when the jury trying the Seekers Case was at the show. In fact, I cannot say of my own knowledge that the jury witnessed the show, I am willing to say, however, that if the jury did witness the show the jurors were probably influenced, even though unconsciously, to the prejudice of the defendant Seekers. The portrayals of death and suffering in the picture were such that it would have been most difficult for the jurors not to associate the scenes in the show with the testimony in the case. The two trials in which the defendants were convicted in the show were quite vividly portrayed and the verdicts rendered against the defendants could hardly have failed to impress the minds of the jurors to the prejudice of the defendant. I have no interest in the Seekers case, but as an attorney interested in the administration of justice in an orderly and proper manner, I feel that I should make this affidavit in support of the defendant's motion for a new trial."

The documents which we have set out were introduced without objections of the solicitor, and the State did not counter with any evidence whatsoever.

We have been unable to find any case in this State in which the question of instant concern, in identical factual form, has been reviewed. We do note, however, that our appellate courts have adhered strictly to the practice of carefully safeguarding the deliberations of the jury. To this end they have consistently recognized the importance of keeping the jury free from all outside or improper influences. This is clearly

evinced in Oliver v. State, 232 Ala. 5, 166 So. 615; Roan v. State, 225 Ala. 428, 143 So. 454, 460; Lakey v. State, 206 Ala. 180, 89 So. 605; Weaver v. State, 17 Ala.App. 506, 86 So. 179.

Many other cases could be cited, but the above are strikingly illustrative of the mind of our appellate courts.

We have read a number of cases in other jurisdictions in which the courts have upheld the action at nisi prius when motion for new trial was denied because the jury was permitted to attend motion picture shows or other places of amusement. In many of these we observe that the State countered with proof which tended to show that the nature of the pictures or performances was not such as would likely influence the jury against the impartial interests of the accused. In some of the cases the jurors were interrogated and gave evidence that the performances in no manner affected their verdict.

The courts generally are very emphatic in condemning and disapproving the practice of allowing jurors impaneled in grave criminal cases to attend any form of public entertainment.

█ We wish here to join heartily in this view. To extend such privileges is likely to imperil the purity and sanctity of judicial administration and destroy public confidence in its justice and impartiality.

In the case at bar the able trial judge did not assent to the liberties about which complaint is made, and certainly he is not to be criticised for the occurrence.

As a precaution presiding judges should be very emphatic and explicit in their instructions to the juries and bailiffs in charge regarding their conduct during the time the jury is required to remain unseparated while trying a cause. By this timely forethought many infractions of the rules could be avoided.

We come to consider the question for review.

█ In approaching the inquiry we must adhere to this doctrine: "The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered." Roan v. State, supra [225 Ala. 428, 143 So. 460].

See also, Weaver v. State, supra; Oliver v. State, supra; Driver v. Pate, 16 Ala.App. 418, 78 So. 412.

In the case of Styles v. State, 129 Ga. 425, 59 S.E. 249, 250, 12 Ann.Cas. 176, the jury, while trying a murder case, was permitted to read an editorial in a local newspaper. The article made no reference to the case at bar, but quoted at length from a statement by the solicitor general in which he commented on the outcome of a murder case which was tried in another section of the state. The effect of the quoted statement was that there was a serious indifference on the part of juries in the matter of convictions in homicide cases. The charge was made that the conditions in this country were such that jurors would not convict in homicide cases "even when the evidence of guilt is overwhelming." It was stated that the remedy needed was a "stirring of the consciences of the people."

In response to the question, Justice Atkinson wrote for the court: "The whole tendency of the editorial was to play upon the passions and emotions of those who read it and to encourage juries to convict in capital cases. An appeal of that character, whether made by a writer, an orator from the pulpit or an actor upon the stage, may be made with such effect as to influence the mind while acting upon any particular matter, without direct reference thereto. When a juror enters upon the trial of a criminal case, the law contemplates his withdrawal from the public and makes no provision for addresses to him from outside sources for his entertainment or otherwise which are calculated, directly or indirectly, to excite any passions or emotions with respect to the matter upon which he is to sit in judgment. Perfect impartiality in the juror is the object of the law. Anything not legitimately arising out of the trial of the case, which tends to destroy the impartiality of the juror, should be discountenanced. Whether beneficial to the state

or to the accused, such things, upon the ground of irrelevancy, should be suppressed and not given the opportunity of influencing the minds or exciting the passions of the jurors. Verdicts should be the result of calm deliberation, founded upon the law and evidence. The accomplishment of that object can never be assured where irrelevant things which tend to destroy the impartiality of the jurors are allowed to creep into the trial."

See also, Cartwright v. State, 71 Miss. 82, 14 So. 526; People v. Stokes, 103 Cal. 193, 37 P. 207, 42 Am.St.Rep. 102.

The case of Shaw v. State, 83 Ga. 92, 9 S.E. 768, was a murder trial. During the course of the proceedings the bailiff took the jury to a prayer meeting which was conducted by the active prosecutor and witness in the case. The court held that a new trial should have been granted despite the fact that the State offered proof that no reference was made in the meeting to "any law case" and that no one spoke to any member of the jury. It was shown also by affidavits of the jurors that their verdict was in no manner influenced by anything that transpired at the meeting or by any occurrence while they were absent from their jury room. The court observed that the religious fervor of the prosecuting witness could have easily caused the jury to have unconsciously added undue weight and credence to his testimony.

In the case of Rigsby v. State, 64 Tex. Cr.R. 504, 142 S.W. 901, 38 L.R.A.,N.S., 1116, it was held reversible error to permit the jury impaneled to try one accused of illegal liquor selling to hear a political address advocating state-wide prohibition.

A case bearing some factual analogy to the case at bar is Norwood v. State, 120 Tex.Cr.R. 510, 48 S.W.2d 276, 277. The accused, nineteen years of age, was on trial for carnal knowledge of his sixteen year old cousin. After the State had introduced a part of its evidence, the officer in charge took the jury in a body to a picture show. This was without the knowledge or consent of the defendant. The jury occupied seats apart from the audience. The picture dealt with sexual relations between a married man and a woman other than his wife. The moral of the portrayed story was that illicit sexual relations destroy the home which is the foundation of society. Each juror testified that in seeing the picture his verdict was in no manner influenced and his conclusion of the guilt of the accused was based solely on the law as applied to the evidence in the case.

In response to the question the court observed: "We are unwilling to speculate as to the effect the picture show had on the jury. The issue of guilt was closely contested. Disclaiming any intention to hold that in every case in which it is shown that the jury have been permitted to attend a public entertainment a reversal should follow, the opinion is expressed that under the facts presented by the present record the presumption of injury was not rebutted."

The able Assistant Attorney General urges in brief and in oral argument that in the instant case there is no dispute that the accused killed the deceased and justification is sought on the doctrine of self defense. Under these circumstances it is insisted the jury could not have been prejudiced or influenced against the lawful rights of the accused by seeing the picture in question. We cannot come to conclude that this should be a controlling factor. After all, the jury was given the task of determining the guilt or innocence of the defendant and in the event of a conviction to fix the punishment.

As we have indicated herein, we are confronted with only the evidence introduced by the appellant in support of his motion for a new trial. We would be compelled to enter into the realm of speculation, conjecture and surmise to hold that by witnessing the performance the jury was not unduly influenced against the interests of the accused.

When we apply the applicable rules of law to the evidence disclosed by this record, we cannot escape the conclusion that the court below was in error in denying appellant's motion for a new trial. A contrary view would do serious violence to the right of trial by an impartial jury.

An impartial jury, selected and kept free from all improper influences, has always

been rigidly regarded by our courts as essential to a fair trial. Society must at all times be exceedingly jealous and cautious of the rights and liberties of its people. When a citizen is accused of crime, the law extends all legal safeguards to assure a fair trial. To this end the law contemplates and demands that when a jury is selected and sworn to try an accused felon it shall be entirely separated from the world so far as any communication affecting the ultimate decision of the case is concerned.

Under no aspect of the evidence was the appellant due the general affirmative charge.

Refused charge B was condemned by this court in Griffin v. State, 28 Ala.App. 314, 184 So. 206. This view was followed in Parsons v. State, 32 Ala.App. 266, 25 So.2d 44, and Brown v. State, 33 Ala.App. 97, 31 So.2d 670.

It appears that error was charged for its refusal in Sterrett v. State, 31 Ala.App. 161, 13 So.2d 776.

We think that the criticism directed against the charge in the Griffin case, supra, is sound.

In the case at bar there was a conflict in the evidence as to whether or not the deceased in any manner assaulted or threatened to assault the appellant. A charge should be refused which assumes a fact to be true which is in dispute. Dykes v. State, 34 Ala.App. 216, 39 So.2d 21; Ray v. State, 248 Ala. 425, 27 So.2d 772; Alabama Oil Co. of Decatur v. Gibson, 229 Ala. 269, 156 So. 771.

Charge H refused to appellant omits the essential element of retreat. Turner v. State, 11 Ala.App. 1, 65 So. 719; Webb v. State, 100 Ala. 47, 14 So. 865.

The vice of refused charge I is clearly illustrated by Chief Justice Anderson in McGhee v. State, 178 Ala. 4, 59 So. 573.

There are other questions presented for our review by this record, however their nature is such that they rarely appear in the trial of a cause and they will not likely reoccur at another trial of this case.

For error which we have herein pointed out, it is ordered that the judgment below be reversed and the cause remanded.

Reversed and remanded.