Appellant was convicted under § 13A-5-31 (a)(5), Code 1975, for the murder of a police officer while on duty. After a separate hearing on aggravating and mitigating circumstances, the jury fixed his punishment at death. Subsequently, the trial court weighed the aggravating and mitigating circumstances pursuant to § 13A-5-33, Code 1975, and sentenced appellant to death. The court issued both oral and written findings of fact from the trial and the sentence hearing which enumerated the aggravating circumstances the court found sufficient to support the sentence of death. This appeal followed.
Some time between 5:00 a.m. and 6:00 a.m. on Saturday, June 21, 1980, O'Jim's Restaurant in Eutaw, Alabama was robbed by appellant and a female companion, Jeanette Kennedy. After Kennedy left the restaurant, appellant pulled a pistol on waitress Corethea Hitton and demanded "give me all your money." Ms. Hitton complied with the demand. Appellant and Kennedy speedily fled, and Ms. Hitton called the Eutaw Police.
About 35 miles from the scene of the robbery, appellant, who was driving the getaway vehicle, was spotted by Livingston University Police Officer Wayne Sudduth, who was assisting in the search for the suspects. Officer Sudduth was aware that the robbery had occurred and apparently had knowledge of the description of the getaway vehicle from a police radio broadcast.
Officer Sudduth informed Livingston Police Officer Raymond Burne that he was stopping the vehicle. Officer Sudduth, who was dressed in a blue uniform, was driving a marked police car.
With his flashing lights on, Officer Sudduth stopped the vehicle which contained *Page 1340 
appellant and Kennedy. He approached the driver's side of the car and asked for appellant's driver's license. Appellant opened the car door and reached around as if to get his billfold. However, according to the testimony of witness Kennedy, rather than removing his billfold he grabbed a .38 caliber revolver and shot Officer Sudduth, killing him. The evidence indicated that Officer Sudduth did not have his service revolver drawn, as it was found in his holster with the safety strap in place.
After the shooting of Officer Sudduth, appellant and Kennedy sped away, only to wreck their vehicle on the western edge of Livingston. Both exited the car and walked up the road where they hid in some bushes until a truck driven by Mr. Johnny Mathews approached. Mathews saw appellant come from under a bridge and act as if he were injured. Mathews stated that appellant was yelling for help and he stopped his truck on the side of the road. When appellant came within close proximity of the truck, he pulled the revolver, pointed it at Mathew's face and demanded the keys to the truck. After a brief period of time, during which Sumter County Deputy Sheriff Ralph Rainey drove past appellant, Kennedy, and Mathews, appellant secured the keys and fled with Kennedy.
Deputy Rainey reported what he had seen to the Livingston Police Department and was informed that he had observed the restaurant robbery suspects. Deputy Rainey set a roadblock and while moving his patrol car to allow a vehicle to pass, appellant drove Mathew's truck past him. A high speed chase ensued involving several vehicles.
Another roadblock had been set by York city police officers about halfway between Livingston and York. As the truck approached, the officers at the roadblock began to fire at it. Immediately thereafter, the truck wrecked and overturned. Subsequently, Deputy Rainey saw appellant throw a gun out of the truck cab. Deputy Rainey immediately retrieved it. Appellant and Kennedy were taken into custody, transported to a local hospital for examination, and afterwards taken to Sumter County Jail.
Several issues are presented for review.
 I
Appellant contends that the jury's exposure to the media coverage of the assassination attempt on the life of the President of the United States, which attempt occurred during the trial of the case, was prejudicial to appellant's due process and equal protection guarantees and his right to a fair trial. Appellant urges that the trial court erred to a reversal in denying the motion for a new trial on this ground.
The issue, of course, is not whether the exposure to the media coverage improperly influenced any member of the jury, but whether it might have unduly affected any juror to act outside the evidence in arriving at a verdict. Seekers v.State, 35 Ala. App. 40, 44 So.2d 628 (1949).
The guilt phase of the trial was begun on March 30, 1981, and was concluded March 31, 1981. The sentencing phase was held on the succeeding day, April 1, 1981. The presidential assassination attempt occurred on March 30, 1981, the first day of the trial.
At the conclusion of the sentencing phase and after the jury had returned its verdict, appellant requested a polling of the jury to determine whether the jurors had been permitted to watch television coverage of the assassination attempt or to read newspaper articles about it. The trial court denied the jury polling request but stated for the record that the jurors had seen the television reports.
Appellant relies heavily on Seekers, supra, in furtherance of his position. Seekers is readily distinguished from this case. In Seekers, the jury, during an overnight recess, attended a rather gory movie; there were a number of coincidental similarities between the plot of that movie and the evidence presented in the case the jury was then hearing. One of the affidavits in the motion for a new trial in Seekers alluded to the similarities as follows: *Page 1341 
 ". . . The portrayals of death and suffering in the picture were such that it would have been most difficult for the jurors not to associate the scenes in the show with the testimony in the case. The two trials in which the defendants were convicted in the show were quite vividly portrayed and the verdicts rendered against the defendants could hardly have failed to impress the minds of the jurors to the prejudice of the defendant."
In the case at bar, there are no indications of any similarities between matters in the news reports and any of the evidence being considered by the jury.
The news reports obviously contained no communication, information, opinion, or other discussion of any facet of appellant's trial which would tend to affect the ultimate decision in the instant case.
We cannot say that the jury's viewing television news reports of the attempted assassination of the President might have unduly influenced any member of the jury to act outside the scope of the evidence presented in this trial. Consequently, we find no error in the trial court's ruling in that regard.
 II
Appellant argued in his motion for a new trial that the State impermissibly used its peremptory strikes in an unconstitutional, racially biased manner to remove blacks from the venire.
Appellant is black and the victim was white. Appellant's jury consisted of seven blacks and five whites.
At the hearing on the motion for a new trial, appellant offered proof that the State used its peremptory strikes to remove twenty blacks, ranging in age from 21 to 64 years, from the venire. Appellant also identified the struck jury by name, race, and age. No evidence on this issue was offered by the State.
Appellant relies heavily on Swain v. Alabama, 380 U.S. 202,85 S.Ct. 824, 13 L.Ed.2d 759, reh. den. 381 U.S. 921,85 S.Ct. 1528, 14 L.Ed.2d 442 (1965). The thrust of appellant's objection appears to focus on the exclusion of "young blacks" from petit juries.
The record is void of any evidence of systematic striking of blacks or "young blacks" from petit juries or of a history of purposeful discrimination against a particular race. Swain, at380 U.S. 221, at 85 S.Ct. 836, provided, "[W]e cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws." Therefore, we do not think appellant has carried the burden of proof which Swain requires.
Additionally, this court recently decided the peremptory challenge issue, contrary to appellant's argument, in Allen v.State, 414 So.2d 163 (Ala.Cr.App. 1982).
The trial court's ruling on this issue was correct.
 III
Appellant contends that he was unconstitutionally deprived of an impartial jury in that (a) two members of the venire were improperly excused for cause due to their opposition to capital punishment, and (b) two of the State's jury voir dire questions were improper. We do not agree.
Appellant urges that two of the prospective jurors, Daisy Belle Cannon and Sim McCasson, were improperly excused for cause by the trial court in violation of the standard set out in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770,20 L.Ed.2d 776, reh. den. 393 U.S. 898, 89 S.Ct. 67,21 L.Ed.2d 185 (1968).
As to prospective juror Cannon, the record reveals the following (R. 256-257):
 "MR. WATKINS [Prosecutor]: Yes, sir. Ladies and Gentlemen, the Judge has already qualified you on capital punishment, but I would like to go into it a little bit further to make sure that we understand each other.
 "This case that we are going to try is one of the cases enumerated in the statute that says that a person may receive death if you find him guilty of a certain offense; and, I want to know *Page 1342 
if we all understand each other, that each of you are telling me individually, that if you believe beyond a reasonable doubt and to a moral certainty the necessary elements to return a verdict, which would mean that this person would be put to death by electrocution, that you would be able to do that? Is that what everybody is telling me? Is there anybody that would not be able to do that?
"PJ: I don't believe I would.
 "THE COURT: All right; would you please stand up and give your name, please ma'am?
 "PJ CANNON: Daisy Cannon. And, I just don't believe I could send anyone to the electric chair.
 "MR. WATKINS [Prosecutor]: Mrs. Cannon, are you telling the Court that no matter what the evidence is; that if you believe beyond a reasonable doubt and to a moral certainty that this person did it; that if we follow the statute to show that we can prove all the necessary elements, that you would not be able to vote guilty if it meant that he would be sent to death?
"PJ CANNON: I don't think I would."
And as to prospective juror McCasson, the record shows (R. 279-280):
 "THE COURT: In this case, the State of Alabama, if the defendant is found guilty of the charge in the indictment, has indicated they plan to ask for the death penalty if the defendant is found guilty beyond a reasonable doubt as charged. Now, is there anyone on the jury panel that has a fixed opinion against capital punishment? In other words, does anyone have a strong feeling, a fixed opinion, against capital punishment? If so, I would like to see a show of hands.
 "Yes sir. Mr. McCasson. You have an opinion against capital punishment?
"PJ McCASSON: Yes, sir.
 "THE COURT: And, you do not feel that you would be able to return a verdict sentencing someone to the electric chair if they were found guilty beyond a reasonable doubt and to a moral certainty of the crime of the charges; is that correct?
 "PJ McCASSON: My opinion about it, I think it should be some other way without taking a life for a life.
 "THE COURT: All right; I understand and I respect that, sir. I am just trying to ascertain each one of your opinions. So, it is your view that you have a fixed opinion against capital punishment?
"PJ McCASSON: Yes sir.
 "THE COURT: No matter what the evidence would be in a case you would not be able to vote for capital punishment?
"PJ McCASSON: Yes, sir."
We deem it emphatically clear from the record that both potential jurors were so opposed to capital punishment that they would not be able to vote for the death penalty no matter what the evidence showed. Prospective juror Cannon indicated that she would not be able to return a guilty verdict if it meant the imposition of the death penalty. Prospective juror McCasson indicated that he had a fixed opinion against capital punishment regardless of what the evidence might be. As we perceive Witherspoon, a challenge for cause is permitted in both instances. The court in Witherspoon, supra, n. 21, said:
 "We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. . . ." (Emphasis in original)
We hold that the record shows that the two prospective jurors in question were properly excused for valid reasons. *Page 1343 
Appellant complains that two of the State's jury voir dire questions were tantamount to eliciting a promise from each prospective juror to impose the death penalty if appellant was found guilty. The State contends that, though possibly inartfully phrased, the questions were designed to determine whether any venire member's opposition to capital punishment was such that it would prevent him or her from returning a guilty verdict in the face of adequate proof of the necessary elements of the offense.
The first question to which appellant takes exception is the voir dire question to which prospective juror Cannon responded, hereinabove discussed.
The question essentially is: Are each of you telling me that if you believe beyond a reasonable doubt and to a moral certainty that the necessary elements have been proven, you would return a verdict which would put this person to death by electrocution?
It is obvious the question relates to the guilt stage verdict because it refers to "the necessary elements" in its text. Certainly, prospective juror Cannon interpreted the question as relating to the guilt phase because of the manner in which she responded. The trial court, in a follow-up question referred to "the necessary elements," thus indicating reference to the guilt phase of the trial. Additionally, when the question is viewed in context with the entire voir dire on this matter, the phrase "would be able" refers to the ability to keep an open mind on the subject, as opposed to having a fixed opinion which would require an acquittal, regardless of the evidence, in order to avoid the death penalty. Witherspoon, supra.
Appellant's counsel did not take exception to the question at the time, nor did he seek to determine, through clarifying questions, how the venire may have interpreted the question. We note, however, that counsel was permitted to and did examine the venire members extensively, including determination of religious preferences and political affiliations.
The remaining voir dire question appears as follows (R. 280-281):
 "MR. WATKINS [Prosecutor]: Ladies and Gentlemen, the Judge has already told you that this is a case wherein there may be a verdict of death by electrocution; and, all of you have said that you believe in capital punishment, except for this one gentleman. Now, I want you to search your conscience and let's really talk about this thing before we go too far. It is my understanding from you that we all understand that the State has the burden of proving to you beyond a reasonable doubt and to a moral certainty, that this man is guilty as charged. I'm asking you to go one step further in assuming that the State of Alabama proves to you beyond a reasonable doubt and to a moral certainty that this man is guilty of the capital offense as charged, will all of you promise to me that you will be about [sic; able?] to return a verdict that will place him in the electric chair and cause his death? Everybody, search your conscience now and answer it honestly because that's all we want to know is what you are thinking and how you feel. Would each of you tell me that if I prove to you, the State proves to you, beyond a reasonable doubt and to a moral certainty that this man is guilty as charged of a capital offense, that you will be able
to vote for the death penalty?
(No Response.)
 "MR. WATKINS [Prosecutor]: I take it by your silence that you all will.
"Thank you. That's all." (Emphasis added.)
Appellant objected to the manner in which the question was framed, pointing out that silence was an affirmative response which would preclude a guilty verdict on a lesser included offense. Appellant moved for a mistrial, which the trial court denied.
While the framing of the question and its lack of clarity is subject to criticism, we *Page 1344 
find that the inquiry was not a solicitation of a promise to return a capital punishment verdict. When considered in context, this question again sought a determination of whether any venire member would be unable to vote for the death penalty due to a fixed opinion on the issue of capital punishment. As above, we perceive that this inquiry is well within the framework set out in Witherspoon, supra. Again, it is noted that appellant's objection went only to the form of the question. No attempt was made by appellant to clarify the intended purpose of the question in his voir dire examination. This adds credence to the theory that the interpretation of the purpose of the question at the time by appellant significantly differs from the argument he presently advances.
The trial court's denial of the motion for a mistrial does not constitute error.
 IV
Appellant argues that the death penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He concedes that the prevailing view is that the death penalty is not per se cruel and unusual punishment, but urges that the application of it in this case is constitutionally prohibited. We disagree with this contention.
We have reviewed this case in detail in keeping with our Supreme Court's mandate in Beck v. State, 396 So.2d 645 (Ala. 1980), which is as follows:
 "To insure that sentences of death will not be arbitrarily and capriciously imposed, we hold that both the Court of Criminal Appeals and this Court should examine all death sentences in light of the standards and procedure approved in Gregg [Gregg v. Ga., 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859
(1976)]. Each death sentence should be reviewed to ascertain whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant. In making this final determination, the courts should examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any."
The offense with which appellant was charged and convicted is unquestionably a capital offense under the provisions of § 13A-5-31 (a)(5), Code 1975. We find that the evidence was sufficient to meet the degree of proof required to sustain a conviction under that code section.
In reviewing the death sentence determined by the jury, the trial court found two aggravating circumstances:
 1. The capital felony was committed for the purpose of avoiding or preventing a lawful arrest.
 2. The capital felony was committed while the defendant was engaged in flight after committing a robbery.
Appellant contends that the first aggravating circumstance essentially duplicates the offense charged in the indictment and, therefore, may not be considered an aggravating circumstance in this case, citing Keller v. State,380 So.2d 926 (Ala.Crim.App. 1979), cert. denied, 380 So.2d 938 (Ala. 1980). The rule in Keller, to the effect that the aggravating circumstance charged in the indictment cannot be used as both the criminal charge and the circumstance aggravating that charge, has been tacitly overruled in Kyzer v. State,399 So.2d 330 (Ala. 1981), and Beck, supra.
However, in the case before us, the enumerated aggravating circumstance of avoiding or preventing a lawful arrest is not an integral element of the basic aggravating circumstance alleged in the indictment. Therefore, the rule in Keller, even if it were still intact, would have no application here.
As to the remaining aggravating circumstance enumerated in the trial court's order, appellant contends the State failed to prove he was in fact in flight after committing a robbery.
The appellant testified at the sentencing hearing before the trial judge; he did not *Page 1345 
testify before the jury at either the guilt phase or sentencing phase of the trial. At the sentencing hearing, he admitted having committed the robbery of O'Jim's Restaurant, driving the car from the robbery scene and being stopped by an officer in a police car approximately 30 miles from the robbery scene. He testified that he was exceeding the speed limit at the time, and that he was not sure why he was being stopped by the officer. Other evidence indicated the victim stopped appellant within approximately 30 minutes of the robbery. Appellant further testified that he did not shoot the police officer, but that it was Jeanette Kennedy, his girlfriend and companion, who did the shooting. Kennedy testified during the guilt phase of the trial that appellant robbed O'Jim's Restaurant and that he drove from the scene "real fast." Kennedy further testified that appellant shot the police officer immediately after the police officer approached the driver's side of the car and asked to see appellant's driver's license.
We find that the evidence is sufficient to justify beyond a reasonable doubt the trial court's findings regarding the "in flight after committing a robbery" aggravating circumstance.
The remaining considerations are whether similar crimes throughout the state are being punished capitally, and whether the sentence of death is appropriate in relation to this particular defendant (appellant). We answer both questions in the affirmative.
The death penalty is appropriate punishment for the murder of a police officer, as in this case. The death penalty has been consistently applied in similar cases. The death penalty was imposed by the Geneva County Circuit Court for the murder of a sheriff in Cade v. State, 375 So.2d 802 (Ala.Cr.App.), aff'd.,375 So.2d 828 (Ala. 1979), vacated and remanded on othergrounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980),rev'd. on other grounds, 405 So.2d 699 (Ala. 1981). Also, the death penalty was imposed by the Coffee County Circuit Court for the murder of a sheriff in Magwood v. State, 426 So.2d 918
(Ala.Cr.App. 1982). See also Daniel v. State [Ms. 4 Div. 987, April 20, 1982] (Ala.Cr.App. 1982).
Appellant argues that Jeanette Kennedy, appellant's girlfriend and companion, was an accomplice and that her sentence of 20 years (on her guilty plea) is so substantially out of line with appellant's death sentence as to require reversal under the provisions of Beck. We do not agree with appellant's position. Appellant argues in brief that it was Kennedy, not appellant, who "gunned down Officer Sudduth," and that she got only 20 years for the murder of a police officer. The jury and trial court judge heard the testimony and cross-examination of Kennedy and were in a position to observe her demeanor and form conclusions as to her credibility; the trial court judge heard the testimony of appellant (at the sentencing hearing) and he was in the best position to judge appellant's credibility. From the conclusions reached by the jury and the trial court judge, which we find to be adequately substantiated by the evidence, appellant shot the police officer. The jury and trial court judge were well within their prerogatives in so finding. It is noted from the testimony that it was appellant who initially procured the gun, who pulled the gun in the restaurant robbery, who had the gun during the taking of a pickup truck after he wrecked his vehicle, and who threw the gun out of the wrecked pickup truck after it was wrecked. In summary, all of the factors in this case considered, appellant's death sentence is not excessive when compared to the 20-year sentence received by his girlfriend and companion, Jeanette Kennedy.
As to the mitigating circumstances, the "Order of Court Sentencing Defendant to Death"[1] states:
 "The court finds that the following mitigating circumstance enumerated in Section 13-11-7, Code of Alabama 1975, was *Page 1346 
present but insufficient to outweigh the aggravating circumstances:
 "The Defendant has no significant history of prior criminal activity."
The appellant contends that the above order reveals that the trial court considered only the statutory mitigating circumstances, to the exclusion of any nonstatutory mitigating circumstances, in violation of Lockett v. Ohio, 438 U.S. 586,98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and Beck, supra. Further, appellant contends that the evidence of nonstatutory mitigating circumstances was not weighed by the jury or the trial court.
Beck provides that the trial court must permit a defendant to introduce any matter relating to mitigating circumstances at the sentencing phase of the trial. Lockett declared unconstitutional an Ohio statute which precluded the sentencing judge from considering non-statutory mitigating factors, such as character, age, lack of specific intent to cause death, etc.
The trial court allowed appellant to present testimony at the jury sentencing hearing from several friends and relatives concerning appellant's background, life, and character. The jury sentencing hearing was held on April 1, 1981, the day after conclusion of the guilt phase trial.
In his instructions to the jury, the trial judge outlined the statutory mitigating circumstances, and further instructed the jury:
 "So those are the mitigating circumstances that the law of Alabama provides. In addition to mitigating circumstances that I just read to you, you may also consider as a mitigating circumstance any aspect of the defendant's character, his life, and any of the circumstances of the capital offense which tend to indicate that the defendant should not be sentenced to death. Mitigating circumstance does not have to be included on the list that I have read to you in order for you to consider it. Mitigating circumstances considered by you should be based on the evidence that you have heard. And if you are satisfied from the evidence presented during the guilt stage of the trial or during the sentencing hearing, that a mitigating circumstance exists in this case then you should consider it. Mitigating circumstance need not be proven to you — need merely be proven to your satisfaction. It does not have to be proven beyond a reasonable doubt for you to consider it. Only an aggravating circumstance has to be proven beyond a reasonable doubt and that burden is on the State."
The record is void of any reasons to suspect that the jury either disregarded the testimony of appellant's witnesses, or ignored the trial court's instructions.
A crucial assumption underlying the jury system is that juries will follow the instructions given them by the trial judge. Parker v. Randolph, 442 U.S. 62, 99 S.Ct. 2132,60 L.Ed.2d 713 (1979). This leads to the inescapable conclusion that the jury, acting within the bounds of its prerogative, unanimously found that the aggravating circumstances outweighed the statutory and nonstatutory mitigating circumstances.
The failure of the trial judge to specifically refer to the non-statutory mitigating factors does not evidence his failure or refusal to consider them in the sentencing of appellant. The trial court's failure to specifically mention non-statutory mitigating circumstances may be interpreted merely as a conclusion on the judge's part that non-statutory mitigating circumstances were insufficient to outweigh the aggravating circumstances. The trial judge had previously presided over the guilt phase of the trial and the jury sentencing hearing; during the latter hearing he had instructed the jury that they "may consider as a mitigating circumstance any aspect of the defendant's character, his life, and any of the circumstances of the capital offense which tend to indicate that the defendant should not be sentenced to death," and admitted evidence of the same for the jury's and his consideration. Clearly, there is nothing in the record to indicate that the judge or jury failed to consider all evidence of any possible *Page 1347 
mitigating circumstances presented to them.
For these reasons, we reject appellant's contentions regarding non-statutory mitigating circumstances.
 V
Appellant attacks the validity of the indictment under which he was tried as being insufficient as a matter of law and as being totally and fatally defective. A motion to dismiss and/or demurrer to the indictment, which was overruled, raised these grounds prior to arraignment. Appellant urges that a capital offense indictment must allege the aggravating circumstances relied on to elevate a non-capital offense to a capital offense, citing § 13A-5-31 (a), Code 1975.
The charging part of the indictment is as follows:
 "Percy Leo Dobard . . . did, unlawfully and with malice aforethought intentionally cause the death of another person, Carlton Wayne Sudduth, by shooting him with a pistol; while the said Carlton Wayne Sudduth was a police officer on duty as a Livingston University Security Police Officer under the provisions of Title 16-53-12, Code of Alabama, 1975 in violation of 13A-5-31 of the Code of Alabama against the peace and dignity of the State of Alabama."
Section 13A-5-31 (a), Code 1975, provides:
 "(a) If the jury finds the defendant guilty, it shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation, which must also be averred in the indictment, and which offenses so charged with said aggravation shall not include any lesser offenses:
 "(1) Kidnapping for ransom or attempts thereof, when the victim is intentionally killed by the defendant;
 "(2) Robbery or attempts thereof when the victim is intentionally killed by the defendant;
 "(3) Rape when the victim is intentionally killed by the defendant; carnal knowledge of a girl under 12 years of age, or abuse of such girl in an attempt to have carnal knowledge, when the victim is intentionally killed by the defendant;
 "(4) Nighttime burglary of an occupied dwelling when any of the occupants is intentionally killed by the defendant;
 "(5) The murder of any police officer, sheriff, deputy, state trooper or peace officer of any kind, or prison or jail guard while such prison or jail guard is on duty or because of some official or job-related act or performance of such officer or guard;
 "(6) Any murder committed while the defendant is under sentence of life imprisonment;
 "(7) Murder in the first degree when the killing was done for a pecuniary or other valuable consideration or pursuant to contract or for hire;
 "(8) Indecent molestation of, or an attempt to indecently molest, a child under the age of 16 years, when the child victim is intentionally killed by the defendant;
 "(9) Willful setting off or exploding dynamite or other explosive under circumstances now punishable by sections 13A-7-21 through 13A-7-23 or 13A-7-41
through 13A-7-43, when a person is intentionally killed by the defendant because of said explosion;
 "(10) Murder in the first degree wherein two or more human beings are intentionally killed by the defendant by one or a series of acts;
 "(11) Murder in the first degree where the victim is a public official or public figure and the murder stems from or is caused by or related to his official position, acts or capacity;
 "(12) Murder in the first degree committed while the defendant is engaged or participating in the act of unlawfully assuming control of any aircraft by use of threats or force with intent to *Page 1348 
obtain any valuable consideration for the release of said aircraft or any passenger or crewman thereon, or to direct the route or movement of said aircraft, or otherwise exert control over said aircraft;
 "(13) Any murder committed by a defendant who has been convicted of murder in the first or second degree in the 20 years preceding the crime; or
 "(14) Murder when perpetrated against any witness subpoenaed to testify at any preliminary hearing, trial or grand jury proceeding against the defendant who kills or procures the killing of witness, or when perpetrated against any human being while intending to kill such witness."
Also germane to the issue here presented is § 13A-5-35, Code 1975, which provides: "Aggravating circumstances shall be the following:
 "(1) The capital felony was committed by a person under sentence of imprisonment;
 "(2) The defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person;
 "(3) The defendant knowingly created a great risk of death to many persons;
 "(4) The capital felony was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping for ransom;
 "(5) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
 "(6) The capital felony was committed for pecuniary gain;
 "(7) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; or
 "(8) The capital felony was especially heinous, atrocious or cruel. (Acts 1975, No. 213, § 6; Code 1975, § 13-11-6.)"
The thrust of appellant's position is that "aggravation is such a necessary and elementary part of the Death Penalty Act that the defect of failing to accuse a defendant of aggravation in an indictment which also accuses him of one of the offenses enumerated in Title 13A, Section 13-5-31, Code, renders such an indictment void." We do not agree.
Substantial confusion has been caused by the two separate but related concepts of "aggravation" and "aggravating circumstances" contained in the 1975 Act. However, we are convinced that the § 13A-5-35 aggravating circumstances need not be averred in the indictment.
Section 13A-5-31 contains the definitional aggravation required to elevate a non-capital offense. Beck, supra; Kyzer, supra. In the present case, the non-capital offense of murder of an individual was elevated to a capital offense because the individual was intentionally killed while he was a police officer on duty. This analogy is in keeping with the holding inKyzer, supra, at 338, as follows:
 "If a defendant is convicted of `murder in the first degree wherein two or more human beings are intentionally killed,' and if the jury, after a hearing conducted in accordance with the principles set out in Beck, fixes that penalty at death, the trial judge, if convinced that the `aggravation' averred in the indictment `that two or more human beings were intentionally killed by the defendant by one or a series of acts' outweighs the mitigating circumstances, may impose a sentence of death by setting forth in writing, as required by § 13-11-4, his findings, even though the `aggravating circumstance' is not `enumerated in § 13-11-6.' The jury could make the same finding at its sentence hearing mandated by Beck."
In the present case, the aggravation averred in the indictment is found in the phrase "while the said Carlton Wayne Sudduth was a police officer on duty." The aggravating circumstances enumerated in § 13A-5-35 are relevant only to the issue *Page 1349 
of whether a defendant should be given the death penalty after having been convicted of a capital offense described in § 13A-5-31. Consequently, we find no error in the trial court's overruling of appellant's motion to dismiss and/or demurrer to the indictment.
 VI
Lastly, appellant contends that the State, in its closing argument to the jury in the guilt phase of the trial, impermissibly commented on his failure to testify. Appellant made no objection to the questioned comment and, thus, the possible need for curative instructions was not called to the trial court's attention.
The State urges that the failure of appellant to interpose a timely objection constituted a waiver, which does not preserve the matter for review by the court. We disagree, because the "plain error" rule applies and we are obligated to search the record for prejudicial error.
The portion of the State's closing argument of which appellant complains is (R. 563):
 "There is no evidence before you that could give you any reason why you could think that Jeanette Kennedy shot Office [sic] Sudduth as opposed to Mr. Dobard. The evidence is very clear. As far as I can see, and it is undisputed, that Percy Dobard shot and killed Officer Wayne Sudduth."
Where there has been a direct comment by the State on the defendant's failure to testify, and the trial court has not acted promptly to cure such improper comment, there is no question that a conviction must be reversed because it violates constitutional rights. However, indirect references to the defendant's failure to testify present questions more difficult to resolve. While an accused's constitutional guarantees must be preserved inviolate, the State's prerogative to fairly comment on the evidence should not be unduly restricted.
The testimony of witness Kennedy was to the effect that appellant reached to get his driver's license and, instead, drew his gun and fired the fatal shots. Upon the conclusion of the State's case, appellant rested without offering any evidence. Our search of the record fails to disclose any evidence disputing witness Kennedy's testimony that appellant shot and killed Officer Wayne Sudduth.
Where the State's evidence does stand uncontradicted, the prosecutor does have a right to point this out to the jury.Beecher v. State, 294 Ala. 674, 320 So.2d 727 (1975). Does the manner in which it was pointed out rise to the level of being an indirect comment on the defendant's failure to testify? We think not.
It is undisputed that the only people who could testify to the events surrounding the shooting of Officer Sudduth were appellant and witness Kennedy. We perceive, however, that Kennedy may have testified in appellant's defense, or may have lessened the harshness of her testimony to appellant's benefit had appellant called her as his witness. At the time of appellant's trial Kennedy had pleaded guilty to "these crimes" and had been sentenced to 20 years in the penitentiary. Since she had already been sentenced at the time of her testimony, it could hardly be said that she was a captive witness for the State. There was nothing which could have prevented appellant from calling Kennedy as his witness in an effort to have her testify to the "truth" as he remembered the facts.
Physical evidence such as the paths of the bullets and the relative physical positions of appellant and witness Kennedy at the instant of the shooting may have provided proof disputing to some extent the State's evidence.
We hold that the State's closing argument comment could not have been understood by the jury as a reference to the failure of appellant to testify, and was not, therefore, violative of appellant's constitutional right against self-incrimination.
This case is distinguishable from Beecher, supra, in that the comment in Beecher was: "No one took the stand to deny it"; and in *Page 1350 
this case the comment was: "As far as I can see, and it is undisputed, that Percy Dobard shot and killed Officer Wayne Sudduth." It is obvious from the comparison that in Beecher the comment directly called attention to lack of testimony from "the stand," whereas in the case before us no reference was made to lack of testimony.
The State's comment in this case is properly within the virtual identification doctrine, which was quoted with approval by our Supreme Court in Ex parte Yarber, 375 So.2d 1231 (Ala. 1979), at page 1234, as follows:
 "This doctrine requires that any covert statement be construed against the defendant. `In other words, no matter what the jury might infer, there must virtually be a direct identification of the defendant alone as the individual who has not become a witness.' King v. State, 45 Ala. App. 348, 352, 230 So.2d 538, 541 (1970)."
We hold that the State's comment is not violative of the limitation placed upon comments dealing with the "uncontradicted," "undisputed," or "undenied" nature of the State's evidence, and does not run afoul of the doctrine expressed in Yarber, supra.
We conclude, therefore, that the State's closing comments in this case did not violate appellant's constitutional rights.
We have searched the record for error, as required by law, and have found no error harmful to the substantial rights of appellant. The judgment of the circuit court is affirmed.
AFFIRMED.
All the Judges concur.
[1] The trial judge's order setting the penalty is hereby attached as Appendix A.
 APPENDIX A STATE OF ALABAMA, * IN THE CIRCUIT COURT OF Plaintiff * Vs. * MARENGO COUNTY, ALABAMA PERCY LEO DOBARD, * Defendant * CASE NUMBER: CC-81-058
 ORDER OF COURT SENTENCING DEFENDANT TO DEATH
This being the day set for the sentence hearing required by Section 13-11-3, Code of Alabama 1975, concerning the issue of whether or not the Court will sentence the Defendant to death or life imprisonment without parole; and the Defendant, his Attorney and the District Attorney were present in Court; and the Court after hearing the relevant evidence relating to aggravating or mitigating circumstances enumerated in Sections 13-11-6 and 13-11-7, Code of Alabama 1975, is of the opinion that the punishment of death previously fixed by the jury should be imposed on the Defendant.
The Court finds that the following aggravating circumstances enumerated in Section 13-11-6, Code of Alabama 1975, were present in this case, and these circumstances are sufficient to support the sentence of death:
 1) The capital felony was committed while the Defendant was engaged in flight after committing a robbery.
 2) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest.
The Court finds that the following mitigating circumstance enumerated in Section 13-11-7, Code of Alabama 1975, was present but insufficient to outweigh the aggravating circumstances:
 The Defendant has no significant history of prior criminal activity.
The Court further finds that the Defendant was the person who intentionally fired the shot that killed the victim. The Court finds that none of the other enumerated mitigating circumstances were present in this case.
It is, therefore, the judgment and opinion of the Court that it is now proper to pronounce judgment and sentence the *Page 1351 
Defendant to death. The Defendant, after being asked if he has anything further to say why sentence of law should not be now imposed upon him, says nothing.
It is, therefore, ORDERED, ADJUDGED and DECREED by the Court that the Defendant, Percy Leo Dobard, is sentenced to death by electrocution as provided by the laws of the State of Alabama. The execution of the sentence of death is suspended, pending the automatic appeal required by law. It is further ORDERED that David Reid, Livingston, Alabama, is appointed to represent the Defendant on appeal and an appeal to the Court of Criminal Appeals of Alabama is entered as required by law.
It is further ORDERED that the Defendant, Percy Leo Dobard, remain in custody during the pendency of the appeal, and that the Sheriff of Sumter County, Alabama, forthwith transport the Defendant to the William C. Holman unit of the prison system and deliver him to the custody of the Warden of William C. Holman unit of the prison system at Atmore, Alabama.
All DONE and ORDERED this, the 13th day of April, 1981.
 /s/ Claud D. Neilson
CLAUD D. NEILSON CIRCUIT JUDGE